Reginald PERRY and Darrell
Perry, Appellants,

v.

UNITED STATES, Appellee.

Nos. 05–CF–662, 05–CF–670.

District of Columbia Court of Appeals.

Argued May 13, 2008.

Decided Dec. 15, 2011.

Robert L. Dillard, with whom Frederick A. Douglas, Washington, DC, was on the brief, for appellant Reginald Perry.

Lee R. Goebes, Assistant Public Defender, with whom James Klein and Samia Fam, Public Defender Service for the District of Columbia, were on the brief, for appellant Darrell Perry.

Anne Y. Park, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III and Elizabeth Trosman, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ, Associate Judge, Retired,[*] and PRYOR and FARRELL,[**] Senior Judges.

RUIZ, Associate Judge, Retired:

Appellants Reginald and Darrell Perry, who are brothers, appeal their convictions after a joint jury trial. They were indicted on a number of assault charges: (1) may-hem while armed (with a shod foot);[3] (2) aggravated assault while armed (shod foot) ("AAWA");[4] (3) assault with a dangerous weapon (shod foot) ("ADW");[5] and (4) (bottle) ADW.[6] Reginald was also charged with possession of a prohibited weapon (bottle) ("PPW").[7] In their first trial—which resulted in a mistrial—the jury acquitted Darrell of the ADW (bottle) charge and hung on the remaining counts.

At the second trial, both Perry brothers were tried for three counts related to an assault with a shod foot (mayhem while armed, AAWA, and ADW), and Reginald was additionally tried for the charges related to the possession and assaultive use of a bottle (ADW and PPW). The jury found appellants guilty of assault[8] (as a lesser-included offense to mayhem while armed), AAWA, and ADW, and acquitted Reginald of the bottle-related charges.[9]

Without objection, the trial court gave an aiding and abetting instruction that this court subsequently found in *Wilson–Bey v. United States*, 903 A.2d 818 (D.C.2006) (en banc), to be improper for a charge of aiding and abetting premeditated murder. Appellants argue that the reasoning of our holding in *Wilson–Bey* applies with equal force to their convictions for AAWA and ADW, and that their convictions for those offenses should be re-

---

[*] Judge Ruiz was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on September 1, 2011.

[**] Judge Farrell was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on January 23, 2009.

3. D.C.Code §§ 22–406, –4502 (2001).

4. D.C.Code §§ 22–404.01, –4502 (2001).

5. D.C.Code § 22–402 (2001).

6. *Id.*

7. D.C.Code § 22–4514(b) (2001).

8. D.C.Code § 22–404(a) (2001).

9. Reginald Perry was sentenced to concurrent terms of imprisonment of 96 months for aggravated assault while armed with a dangerous weapon (shod foot), 24 months for assault with a dangerous weapon (shod foot), 180 days for simple assault and 5 years of supervised probation. Darrell Perry was sentenced to concurrent terms of imprisonment of 102 months for aggravated assault while armed with a dangerous weapon (shod foot), 24 months for assault with a dangerous weapon (shod foot), 180 days for simple assault and 5 years of supervised probation.

versed.[10] Given appellants' failure to object to the instruction, however, our review is limited to plain error. As stated in this opinion and the concurrences filed by Judge Farrell and Judge Pryor, we decide that the instructions were not clearly erroneous as to ADW. We affirm these convictions. Judge Farrell and I come to a different conclusion with respect to aggravated assault, and conclude that the error was clear and sufficiently prejudicial to constitute plain error. We, therefore, reverse appellants' convictions for aggravated assault, and remand for further proceedings.[11] Judge Pryor would affirm those convictions as well, for the reasons stated in his partially dissenting opinion.

## I. Facts

It was undisputed at trial that Jarrell Rogers was assaulted by a group of several men who kicked him repeatedly, causing grave injuries that required hospitalization. It was also undisputed that appellants Reginald and Darrell Perry were involved in at least part of the fight with Rogers. The primary issue at trial was who had instigated the fight, and whether the Perry brothers had been part of the group that brutally assaulted Rogers.

Rogers testified at trial. He said that on the afternoon of October 10, 2003, he had been walking from a Metro station to his home with his fiancée, DeShanna Gelim, and their two young children. As the family walked on the 3000 Block of Naylor Road, in Southeast Washington, D.C., they passed by a group of men. Rogers recognized two of the men—appellants—as the same individuals with whom he had had a "run-in" a year earlier. Gelim said "hi," and Darrell called out some sort of greeting to Rogers and Gelim. The family continued to walk through the group of men. Reginald, who had been leaning against a car, started to walk quickly towards Rogers and his family, "cussing" under his breath. As Reginald approached, Rogers turned around and told him that he would deal with whatever problem Reginald had after he escorted his family into their house. But rather than stop, Reginald continued to approach and attempted to punch Rogers in the face. Rogers ducked, and the punch never landed. Instead, Rogers struck back, punching Reginald three times in the face.

According to Rogers, Darrell and four or five men came running towards him from about 20–25 feet away. Darrell charged twice towards Rogers, jumping into the air as if he intended a flying kick. Each time Rogers was able to "grab" Darrell and "push him into everybody else." They began to "scuffle," until "someone" hit Rogers on the right side of the head with a bottle, knocking him down. While Rogers was on the ground, he was kicked in the face and along the left side of his body. Rogers could not see who delivered the kicks, but he remembered being kicked by Timberland boots. He recalled that

10. Although Reginald did not argue this point in his brief, his counsel informed the court during oral argument that he "incorporates" the arguments on this issue that were made by Darrell's counsel.

11. We reject Reginald Perry's argument that the evidence was insufficient to convict him because there was no "corroboration" of the two witnesses who testified about his involvement in the assault. The evidence was clearly sufficient to support Reginald Perry's conviction of both contested charges. The judge did not commit plain error in refusing to let a police detective, called by Reginald Perry to express his opinion or belief about the victim's ability in his medicated condition to view a photo array. Finally, the judge did not abuse her discretion in denying Darrell Perry's motion for a new trial based on newly discovered evidence, when, as the judge explained (among other things), the proffered testimony of the new witness would have offered little or no aid to the jury on the key factual issue of who had repeatedly kicked Rogers so as to cause his injuries.

Reginald had been wearing Timberland boots but did not know what footwear Darrell had been wearing. Rogers was able to pull "two or three" of the men off their feet, but could not remember that the Perrys were among them. Eventually, Rogers was able to get up, and continued to fight "three more of them." Even though Rogers did not identify the Perrys as among the men with whom he continued to fight, he said they had been part of the group when he was knocked to the ground and when he got back up. ("Everybody that was around me when I was fighting before I fell was still there.")

Gelim testified that she saw someone knock down Rogers with a bottle of liquor. She saw Reginald strike Rogers in the face with a clear bottle or a piece of a bottle that someone had given him, and then "stomp" on Rogers's body and kick him at least thirty times. She said that Darrell also jumped on Rogers's head, like a "trampoline," ten to fifteen times. After Rogers was able to rise to his feet, the group of men, which according to Rogers and Gelim, included the Perry brothers, ran away down Naylor Road. Police officers arrived on the scene shortly thereafter. Both Rogers and Gelim later identified the Perry brothers to investigators.

Rogers was severely injured during the attack, and his face and shoulder had to be reconstructed. He underwent three surgeries and was hospitalized for weeks. Rogers testified at trial that he suffered from migraines as a result of a plate inserted in his head and had lost mobility in one of his arms.

In their defense, the Perry brothers presented evidence that it had been Rogers who initiated the fight. Reginald testified that he was standing on Naylor Road with his brother and a friend by the name of Oliver Davenport when they saw Rogers and his family pass by. After Reginald exchanged greetings with Gelim, Rogers walked towards him, complaining, "one of you disrespected my fiancée." Reginald responded, and they then had "a conversation that led to an argument which led to a fistfight." Davenport testified that Rogers appeared to be "intoxicated." Blood tests taken at Howard University Hospital on the day of the altercation confirmed the presence of alcohol in Rogers' blood.

According to Reginald, it was the much larger Rogers who initiated the fight,[12] hitting him three times in the face. Reginald tried to fight back, but only managed to graze Rogers once on the shoulder. The fight moved to an alleyway, and they threw punches at each other until Darrell came and pulled Reginald out of the fight. Rogers continued swinging and cursing, and Reginald saw Rogers still standing when he, Darrell, and Davenport left the scene. Reginald testified that neither he nor his brother kicked Rogers. He denied hitting Rogers with a glass bottle or seeing anyone else assault Rogers. Reginald's version of events was corroborated by testimony from Davenport, who described the sequence of events in a substantially similar manner. Darrell did not testify or otherwise present any evidence.

Without objection from either the government or defense counsel, the trial court gave the same aiding and abetting instruction that had been given in the first trial. It was the then-standard Criminal Jury Instructions for the District of Columbia (the "Red Book") jury instruction,[13] the

---

12. At the time of trial, Reginald was five feet, nine inches tall, and weighed 155 pounds; Rogers was six feet, three inches tall, and weighed 225 pounds.

13. *See* Criminal Jury Instructions for the District of Columbia, No. 4.02 (4th ed. 1993):
 Any person who in some way intentionally participates in the commission of a crime

use of which this court disapproved of in *Wilson–Bey,* a case decided after appellants' trial. Appellants argue that the rule announced in *Wilson–Bey* requires that their convictions for ADW and AAWA be overturned.

## II. The Holding and Application of *Wilson–Bey*

In *Wilson–Bey,* the theory of prosecution was that the defendants—two sisters—were guilty of first-degree premeditated murder while armed: the older sister as a principal, and the younger sister as an aider and abettor.[14] 903 A.2d at 825. The court instructed the jury, in relevant part, with the applicable instruction from the Red Book that was in use at that time:

> It is not necessary that the defendant have had the same intent that the principal offender had when the crime was committed or *that she have intended to commit the particular crime by the principal offender.* An aider and abett[o]r is legally responsible for the acts of the other persons *that are the natural and probable consequences of the crime or criminal venture in which she intentionally participates.*

*Id.* at 826 (quoting Red Book Instruction No. 4.02 (4th ed. 1993)). Both sisters were found guilty.

In the subsequent appeal, we noted that, with two narrowly-circumscribed exceptions,[15] a conviction for first-degree murder requires the government to establish that the defendant actually intended to kill the victim, and "it would not be enough . . . that the risk of death was reasonably foreseeable." *Id.* at 838 (citing *Comber v. United States,* 584 A.2d 26, 38–39 & n. 12 (D.C.1990)). The trial court's instructions, by indicating that an aider and abettor could be found guilty even if the death of the victim was merely one of "the natural and probable consequences" of her actions, "did not require the prosecution to prove

> can be found guilty either as an aider and abettor or as a principal offender. . . .
>
> To find that a defendant aided and abetted in committing a crime, you must find that the defendant knowingly associated himself with the commission of the crime, that he participated in the crime as something wished to bring about, and that he intended by his actions to make it succeed.
>
> Some affirmative conduct by the defendant in planning or carrying out the crime is necessary. Mere physical presence by the defendant at the place and time of the crime is not by itself sufficient to establish his guilt. However, mere physical presence is enough if it is intended to help in the commission of the crime.
>
> It is not necessary that you find that a defendant was actually present while the crime was committed. . . . *It is not necessary that the defendant had had the same intent that the principal offender had when the crime was committed or that he had intended to commit the particular crime committed by the principal offender.*
>
> *An aider and abettor is legally responsible for the acts of other persons that are the*

> *natural and probable consequences of the crime in which he intentionally participates.*
>
> An aider and abettor is legally responsible for the principal's use of a weapon during an offense if the aider and abettor had actual knowledge that some type of weapon would be used or if it was reasonably foreseeable to the aider and abettor that some type of weapon was required to commit the offense.

(Emphasis added.)

14. At trial, the government introduced evidence to show that the younger sister had first lost a fight with the victim; she then approached her older sister and a group of friends and urged them to help her seek revenge. The group of friends, including both sisters, traveled to the residence of the victim and confronted her in her doorway, and the older sister then fatally stabbed the victim while the younger sister and the rest of the group looked on. *Id.* at 822–24.

15. These exceptions are felony murder (based on a statutorily enumerated felony offense) and conspiracy. *See id.* at 838; *Kitt v. United States,* 904 A.2d 348, 354–56 (D.C.2006).

that [the younger sister] acted upon a premeditated design to kill [the victim], that she specifically intended [the victim]'s death, or even that [the younger sister] knew her sister (or anyone else) intended to kill the decedent." *Id.* at 826. Instead of requiring the government to establish a level of intent that met the high threshold required for premeditated murder, the court allowed the jury to convict the defendant with a mere showing that the murder had been a "natural and probable consequence" of her participation in the confrontation with the victim. This had, in effect, eliminated the intent element from the offense of premeditated murder and allowed the younger sister to be convicted for a murder that, from her perspective, may well not have been premeditated.

Noting that aiders and abettors are subject to the same penalties as principals, *see* D.C.Code § 22–1805 (2001), we concluded:

> [I]t serves neither the ends of justice nor the purposes of the criminal law to permit an accomplice to be convicted under a reasonable foreseeability standard when a principal must be shown to have specifically intended the decedent's death and to have acted with premeditation and deliberation, and when such intent, premeditation, and deliberation are elements of the offense.

*Id.* at 838. We also described the "natural and probable consequences" language as a "negligence-based approach [that] contravenes basic notions of criminal responsibility." *Id.* at 837. Because the instructions had permitted the jury to find the younger sister guilty on such a theory, without requiring a determination that she had the requisite mental state for a conviction of first-degree premeditated murder, we re-

versed her conviction and remanded for further proceedings.

In their briefs, appellants now contend that *Wilson–Bey's* logic similarly applies to their convictions for AAWA and ADW:

> The trial court's instructions ... allowed the jury to convict [appellants] of AAWA and ADW under an aider and abettor theory so long as it concluded beyond a reasonable doubt that [they] had intended to join in *some* crime—*i.e.,* an assault on Rogers—and that it was a reasonable foreseeable consequence that serious bodily injury would result. In other words, the court's instructions permitted the jury to convict [appellants] of the serious felony offenses of AAWA and ADW on a finding that [they] merely had the *mens rea* applicable to the misdemeanor crime of simple assault.

Thus, although appellants do not challenge their convictions for simple assault, they argue that those convictions cannot sustain their culpability as aiders and abettors of ADW and aggravated assault simply because the simple assault consequently escalated into a more serious confrontation.

The government counters that the holding of *Wilson–Bey* was in the context of the "specific intent" offense of premeditated first-degree murder and cannot be applied in these appeals involving the "general intent" crimes of AAWA and ADW. In support, the government cites our opinion in *Kitt v. United States,* 904 A.2d 348 (D.C.2006), where we overturned a conviction for first-degree felony murder because the jury had been given the same jury instruction at issue in *Wilson–Bey,* which we said, was erroneous because specific intent to kill was a required element of the offense.[16] Thus, it was error to instruct

---

16. In *Kitt,* the defendant had been convicted of felony murder for a killing committed in the process of a carjacking, a crime that is not one of the "enumerated" felonies in the District's felony murder statute, D.C.Code § 22–

2101 (2001). We explained that in connection with a felony that is expressly enumerated in the statute, a defendant *can* be convicted of first-degree felony murder where the death of the victim was merely a "natural and

the jury that the defendant could be found guilty of felony murder for a death caused during a carjacking even if he did not have the specific intent to kill the victim. *Id.* at 356.

The government, noting that we have described both AAWA and ADW as general intent crimes, *see, e.g., Gathy v. United States,* 754 A.2d 912, 919 (D.C.2000) ("Under both statutes [for ADW and AAWA], the government must prove that an assault occurred, *i.e.,* an act by the defendant to injure or threaten another, the apparent present ability to injury, and the general intent to commit the act, and that the assault was committed with a dangerous weapon."), argues that we have not extended *Wilson–Bey* to general intent crimes and that it was not an error in this case for the court to read the "natural and probable consequences" jury instruction. That argument reads too much into *Kitt's* reference to specific intent as a limitation to the principle established in *Wilson–Bey.*

First, although *Kitt* involved an offense that requires a specific intent, our reasoning referred to *mens rea* elements generally:

> [*Wilson–Bey* ]'s reasoning and holding apply to other aiding and abetting situations in which an accomplice is charged with an offense requiring proof of specific intent. In all such situations, the rule is exactly the same: where a specific *mens rea* is an element of a criminal offense, a defendant must have had that

*mens rea* himself to be guilty of that offense, whether he is charged as a principal or as an aider and abettor. Thus, to be guilty as an aider and abettor of a felony murder based on an unenumerated felony, a defendant must be shown to have specifically intended the killing. To hold otherwise would be to obliterate, for accomplices only, the material difference between the two types of felony murder.

904 A.2d at 356 (footnote omitted).

██ We have by now made clear that "*Wilson–Bey* is not limited to specific intent crimes." *Wheeler v. United States,* 977 A.2d 973, 986 n. 34 (D.C.2009), *as amended by order,* 987 A.2d 431 (D.C. 2010) (applying *Wilson–Bey* to possession of a firearm during a crime of violence); *Coleman v. United States,* 948 A.2d 534, 552–53 (D.C.2008) (same, second-degree murder). Nor are appellants' arguments premised upon such characterization of the crimes at issue. What appellants argue is that ADW and aggravated assault have *mens rea* requirements different from misdemeanor simple assault, and that the aiding and abetting instruction permitted the jury to find them guilty of those more serious felony offenses, even if their intent was to join only in an unarmed assault. I agree with appellants that to be convicted of ADW and aggravated assault as aiders and abettors, the government had to prove, and the jury needed to find, that they personally had a *mens rea* element beyond that required for simple assault.[17]

---

probable consequence" of the underlying felony, because the legislature has determined that "the only intent required ... is the intent to commit the underlying felony." 904 A.2d at 355. But for unenumerated felonies, the government is required to show not only the commission of the underlying felony, but also that the defendant actually intended to kill the victim. *Id.*

17. After *Wilson–Bey* was decided, the standard aiding and abetting instruction was amended. The current edition of the Red

Book instruction deletes the language italicized in note 12, and proposes, in addition, the following language that is focused on the *mens rea* element of the particular offense that is charged:

> I have already instructed you on the elements of [each of] the offenses[s] with which the defendant is charged. With respect to the charge of [name of offense], regardless of whether a defendant is an aider and abettor or a principal offender, the government must prove beyond a reasonable doubt that the defendant personally

This does not depend on whether the offenses have been labeled as involving "general" or "specific" intent; the relevant question is what is the *mens rea* required for the particular offense, as explained in the next section.[18] Critical to the consideration of appellants' challenge in this appeal is whether the instructions properly conveyed that the *mens rea* elements of ADW and aggravated assault had to be considered for conviction under an aiding and abetting theory of criminal liability.

### III. *Mens Rea* for ADW and Aggravated Assault

A. *A Brief History of Mens Rea in Assault Crimes*

Before turning to the elements of ADW and AAWA, it is helpful to recount a brief history of assault crimes in order to place the ADW and aggravated assault statutes in proper context. At common law, unlaw-fully causing bodily injury to another was charged as either mayhem or battery depending on the degree of resulting harm. *See* MODEL PENAL CODE cmt. § 211.1(a) & (c). "Mayhem, a common-law felony, originally consisted of injury permanently impairing the victim's ability to defend himself or to annoy his adversary.... Battery was a common-law misdemeanor of far broader scope. It covered any unlawful application of force to the person of another willfully or in anger." *Id.* at (a); *see also* ROLLIN M. PERKINS & RONALD N. BOYCE, CRIMINAL LAW 151–82 (3d ed. 1982) ("PERKINS & BOYCE"). Because "the ancient crimes of mayhem and battery required actual contact with the victim[, t]he unsuccessful attempt to accomplish such contact constituted assault and was punished as a misdemeanor at common law." MODEL PENAL CODE cmt. § 211.1.

acted with [insert mens rea required for the charged offense]. [Repeat as necessary for additional offenses, e.g., with respect to the charge of [name of offense] the government must prove beyond a reasonable doubt that each defendant personally acted with [insert mens rea]. [When there are alternate mental states that would satisfy the mens rea element of the offense, such as in second-degree murder (specific intent to kill or seriously injury or conscious disregard of an extreme risk of death or serious bodily injury), the Court may want to instruct that the principal and the aider and abettor do not need the same mens rea as each other.] Criminal Jury Instructions for the District of Columbia, No. 3.200 (5th ed. 2011).

**18.** The notions of "specific intent" and "general intent" crimes—although widely used—can be too vague or misleading to be dispositive or even helpful. Courts and commentators have disapproved of the use of these characterizations of *mens rea* elements generally and in jury instructions in particular. In *United States v. Arambasich*, 597 F.2d 609 (7th Cir.1979), the Seventh Circuit Court of Appeals stated:

[T]he labels "specific intent" and "general intent," which are emphasized in the stock [jury] instructions ... and the distinction the instructions attempt to make between those categories of intent are not enlightening to juries. More specific and therefore more comprehensible information is conveyed by stating the precise mental state required for the particular crime.

*Id.* at 611 (footnotes omitted). The Supreme Court has also intimated such a view. *See, e.g., Liparota v. United States*, 471 U.S. 419, 434–36 n. 16, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985) (noting that the standard "specific intent" instruction "has been criticized as too general and potentially misleading" and suggesting that "[a] more useful instruction might relate specifically to the mental state required under [the statute] and eschew use of difficult legal concepts like 'specific intent' and 'general intent.' " (citing *Arambasich*, 597 F.2d at 613)); *United States v. Bailey*, 444 U.S. 394, 403, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980) ("At common law, crimes generally were classified as requiring either 'general intent' or 'specific intent.' This venerable distinction, however, has been the source of a good deal of confusion."). Labeling offenses as requiring "general intent" or "specific intent" can lead to somewhat opaque analysis in judicial opinions, and outright confusion when they are included in jury instructions.

In the District of Columbia, the misdemeanor common law crimes of attempted battery and intent-to-frighten assault are jointly recognized under the name of "assault." *See* D.C.Code § 22–404(a); *Williams v. United States*, 887 A.2d 1000, 1003 (D.C.2005). The modern crimes of attempted-battery assault with certain aggravating circumstances (*e.g.*, assault with intent to commit certain other crimes, assault with a dangerous weapon, assault on a police officer, assault resulting in serious bodily injury), punishable as felonies, were not recognized at common law. *See* Model Penal Code cmt. § 211.1(c); Perkins & Boyce, at 173. "If the harm to the person was sufficiently great it might constitute a felony—such as murder, manslaughter, mayhem or rape. In such a case the battery (although technically present) became 'merged' in the felony and was not punished as battery." Perkins & Boyce, at 158. However, "[a]ttacks resulting in injuries that fell short of mayhem were thus necessarily treated as ordinary batteries." *Id.* Although a misdemeanor, the sentence for a battery conviction was determined according to the existence of aggravating circumstances involved in the commission of the crime because "[t]he common-law judge had sufficient discretion in affixing punishment for a misdemeanor ... to take proper account of aggravated batteries not amounting to mayhem." Model Penal Code § 211.1; *see also* Perkins & Boyce, at 158.

Modern criminal law has evolved away from the common law's "catch-all" offenses with broad sentencing discretion; today, the various "aggravated" assault crimes are defined by statute. "When the practice developed of limiting the sanctions for misdemeanors to short jail sentences, ... the gap had to be filled by other means. Generally, the legislatures responded by creating a series of intermediate offenses." Model Penal Code cmt. § 211.1. Thus, in creating intermediate assault crimes, the legislatures had two concerns in mind:

> First, attempts to inflict serious bodily injuries were not graded by this [common law] structure at the level that most legislatures thought appropriate. And second, attempts to commit serious offenses like rape and murder, which may have come very close to completion and thus provided evidence of extreme dangerousness on the part of the actor, were not graded at a level that appropriately measured the seriousness of the actor's conduct.

*Id.*

In the District of Columbia, Congress enacted legislation addressing these concerns. First, Congress codified various "assault-with-intent-to" crimes.[19] The

---

19. Congress adopted the Code of Law for the District of Columbia on March 3, 1901. This Code included, in relevant part, the following:

> Sec. 803. Assault with intent to kill, and so forth.—Every person convicted of any assault with intent to kill or to commit rape or to commit robbery, or mingling poison with food, drink, or medicine with intent to kill, or willfully poisoning any well, spring, or cistern of water, shall be sentenced to imprisonment for not more than fifteen years.

> Sec. 804. Mayhem. Every person convicted of an assault with intent to commit mayhem, or of an assault with a dangerous weapon, shall be sentenced to imprisonment for not more than ten years.

> Sec. 805. Assault. Whoever assaults another with intent to commit any other offense which may be punished by imprisonment in the penitentiary shall be imprisoned not more than five years.

> Sec. 806. Whoever unlawfully assaults, or threatens another in a menacing manner, shall be fined more than five hundred dollars, or be imprisoned not more than twelve months, or both.

> Sec. 807. Every person convicted of mayhem or of maliciously disfiguring another shall be imprisoned for not more than ten years.

Act of Mar. 3, 1901, ch. 854, § 804, 31 Stat. 1189, 1321–22.

statutes that Congress enacted remain on the books to this day, albeit in modified form. *See, e.g.,* D.C.Code §§ 22–401 (assault with intent to kill, rob, poison, or commit sexual abuse); –402 (assault with intent to commit mayhem, or with a dangerous weapon); –403 (assault with intent to commit any felony); –404 (assault or threatened assault in a menacing manner; stalking); –404.01 (aggravated assault: resulting in serious bodily injury). Because the common law of assault stretched from the extremes of misdemeanor assault to felony mayhem, these "assault-with-intent-to" crimes were created to allow a court to impose a more appropriate penalty for an assaultive act that results from an unsuccessful attempt to commit a felony or some other proscribed end.[20] The heightened *mens rea* for each of these more serious assault crimes was (and continues to be) framed around the intent to commit the underlying felony or accomplish the proscribed result (*e.g.,* cause serious bodily injury). Thus, it is "not enough for such a crime that the defendant's conduct creates a high degree of risk of death, or of great bodily harm; he must actually intend to cause the specific result required by the statute." LaFave § 16.2(d), at 559. For example, "an assault 'with intent to maim' requires a specific intent to disfigure or dismember; it is not enough recklessly or unlawfully to cause such an injury." *Id.* at 560. Our discussion now turns to the two felony assault crimes at issue in this appeal.

### B. *Assault with a Dangerous Weapon*

■ The statute criminalizing ADW provides simply that "[e]very person convicted ... of an assault with a dangerous weapon, shall be sentenced to imprison-

ment for not more than 10 years," D.C.Code § 22–402. The statute does not define the elements of the crime. As a general matter, "absent a statutory definition of a crime, the common law definition of the offense controls." *Peoples v. United States,* 640 A.2d 1047, 1052 (D.C.1994). Because there was no crime of "assault with a dangerous weapon" at common law, we have interpreted the statute to require no more than is required to prove the common law crime of simple assault, plus the fact that the assault is committed with a dangerous weapon:

> [S]ince the [ADW] statute does not require that the weapon be used with a conscious purpose to inflict injury, the specific intent to inflict ... injury with the weapon is not a necessary element of assault with a dangerous weapon. The statute concerns itself with the danger of the instrumentality used ... without regard to whether it was specifically intended that its use in the particular instance would issue in serious injury. It is not the secret intent of the assaulting party, nor the undisclosed fact of his ability or inability to commit a battery that is material, but what his conduct and the attending circumstances denote at the time to the party assaulted.

*Sousa v. United States,* 400 A.2d 1036, 1044 (D.C.1979) (internal quotation marks and citations omitted); *see also Price v. United States,* 813 A.2d 169, 175 (D.C. 2002) (elements of ADW include the elements of simple assault, and that the defendant "committed the assault with a dangerous weapon."); *cf. Ruffin v. United States,* 642 A.2d 1288, 1296 (D.C.1994) (affirming ADW conviction even though "ap-

---

**20.** The drafters of the Model Penal Code eliminated crimes of the "assault-with-intent-to" variety because they recognized that "[m]odern grading of attempt according to the gravity of the underlying offense has rendered laws of this ... type unnecessary...." Model Penal Code cmt. § 211.1. These offenses continue to be part of the criminal law of the District of Columbia.

pellant and other assailants did not specifically aim [their guns] at [the victims] or intentionally seek to harm them.").

■ Like D.C.Code § 22–4502, which allows for penalty enhancement for committing a crime "while armed," the "dangerous weapon" provision in ADW was similarly intended to enhance the penalty for committing an assault with a dangerous weapon. *See Williamson*, 445 A.2d at 979 ("Assault with a dangerous weapon carries with it more stringent penalties than the simple assault statute, and these penalties are imposed as 'a practical recognition of the additional risks posed by the use of the weapon.'" (quoting *Parker v. United States*, 123 U.S.App. D.C. 343, 346, 359 F.2d 1009, 1012 (1966))). Thus, we have explained that "[t]he gist of the crime of assault with a dangerous weapon ... is found in the *character of the weapon* with which the assault is made." *Id.* (internal quotation marks and citation omitted).[21]

■ Because what warrants a higher penalty for ADW than for simple assault is the increased risk of injury that results from the use of a dangerous object, once an assault is proven, ADW requires a further inquiry to determine whether the object used to commit the assault is a "dangerous weapon." Often the object used in an assault is "inherently" dangerous: *e.g.*, a gun,[22] "rifles, pistols, swords and daggers,"[23] or sulfuric acid.[24] However, in cases where the object is not inherently dangerous and has a non-violent, common-

place use, the government must prove that the actor actually used the object in a dangerous manner. *See Frye v. United States*, 926 A.2d 1085, 1096–97 (D.C.2005) (ADW conviction supported by the evidence because "there was evidence that appellant intended to and did try to injure or frighten [the victim] by using his van as a weapon in a manner likely to cause her to have a car accident."). This is an objective test, and has nothing to do with the actor's subjective intent to use the weapon dangerously. *See, e.g., Powell v. United States*, 485 A.2d 596, 601 (D.C.1984) (rejecting appellant's argument that "unless one is possessed with the specific intent to use an object offensively, it is not a dangerous weapon."); *Williamson*, 445 A.2d at 977 (rejecting appellant's argument that "where the weapon is not dangerous 'per se,' this court should require the government to prove a specific intent to cause physical injury to the victim, or an attempted battery."); *see also Commonwealth v. Connolly*, 49 Mass.App.Ct. 424, 730 N.E.2d 318, 319 (2000) ("The dangerousness of an object that is not inherently dangerous turns on the manner in which it is used (objective test), not the intention of the actor when using it (subjective test).").[25]

■ Thus, the question of whether an object used in an assault that is not inherently a weapon should be considered a dangerous weapon is answered by a factu-

---

21. The phrase "while armed" refers to a penalty enhancement provision, D.C.Code § 22–4502, that "does not require the *use* of or the *intent to use* a weapon in the commission of a crime; it requires mere availability of a weapon." *Washington v. United States*, 366 A.2d 457, 461 (D.C.1976).

22. *Harris v. United States*, 333 A.2d 397, 400 (D.C.1975) (including imitation or unloaded pistols as "dangerous weapons").

23. *See Williamson*, 445 A.2d at 979.

24. *Bishop v. United States*, 121 U.S.App. D.C. 243, 244, 349 F.2d 220, 221 (1965).

25. Unlike the ADW statute, the "while armed" provision, D.C.Code § 22–4502, specifies "any pistol or other firearm (or imitation thereof) or other dangerous or deadly weapon (including a sawed-off shotgun, shotgun, machine gun, rifle, dirk, bowie knife, butcher knife, switchblade knife, razor, blackjack, billy, or metallic or other false knuckles)."

al finding that the object was used in a manner that actually caused a risk of serious injury. Such a finding necessarily proves that the object was "capable of producing death or serious bodily injury *by its manner of use . . .*[,] whether it is *used* to effect an attack or is *handled* with reckless disregard for the safety of others." *Frye,* 926 A.2d at 1097 (quoting *Powell,* 485 A.2d at 601) (emphasis added); *cf. Arthur v. United States,* 602 A.2d 174, 177 (D.C.1992) (recognizing that "it has been the law in the District of Columbia [since 1953] that 'shoes on feet' are dangerous weapons, 'at least when they inflict serious injuries.'" (quoting *Medlin v. United States,* 93 U.S.App. D.C. 64, 65, 207 F.2d 33, 33 (1953))); *Powell,* 485 A.2d at 601 (affirming ADW conviction where "[t]he evidence adduced at trial permitted the jury to conclude beyond a reasonable doubt that the Cadillac, driven at the speeds and in the manner that appellant employed, was likely to produce death or serious bodily injury because of the wanton and reckless manner of its use in disregard of the lives and safety of others."); *cf. Stroman v. United States,* 878 A.2d 1241, 1245–46 (D.C.2005) (reversing conviction for attempted PPW where "[t]he description of the flip flop d[id] not suggest that it was an object likely to cause death or great bodily injury" and "[e]ven assuming that a rubber soled flip flop could inflict great bodily injury, there [wa]s no evidence that the victim in this case, in fact, suffered great bodily injury.").

The principal actor is the one who actually handles the dangerous object or uses an object in a manner that is found to be dangerous. Therefore, the fact of use of a dangerous weapon or the dangerous use of an object in committing an assault is all that is required for conviction of ADW as a principal. With respect to liability as an aider and abettor of armed offenses, however, we have said there must be "evidence to support a reasonable inference that the accomplice was aware the crime would be committed 'while armed.'" *Hordge v. United States,* 545 A.2d 1249, 1256 (D.C.1988) (armed robbery). In *Ingram v. United States,* 592 A.2d 992 (D.C. 1991), we reviewed for plain error a claim that the aiding and abetting instruction failed to convey the accomplice's necessary awareness, *i.e.* that he must have known the principal "was armed and intended to aid [the principal] 'in that respect.'" *Id.* at 1000. While noting that the court "has never addressed in detail the question of the extent to which an accused aider and abettor of an armed robbery must have been aware that the principal who committed the crime was armed," *id.* at 1003, we interpreted *Hordge* as "implicitly" holding that "the 'natural and probable consequence' of the alleged accomplice's actions will not lead to complicity with an armed (rather than unarmed) offense unless the accused could reasonably foresee a weapon would be 'required.'" *Id.* Thus, we also "implicitly held [in *Hordge* ] that, in order to receive the enhanced penalties applicable to a robbery 'when armed' . . . the defendant is entitled to a 'reasonably foreseeable' weapon instruction." *Id.* at 1004. We concluded in *Ingram* that there was no plain error where the aiding and abetting instructions mentioned "natural and probable consequences" but did not include the requirement of actual knowledge or reasonable foreseeability of principal's use of weapon. *Id.*

Following *Ingram,* and applying *Wilson–Bey's* rationale that an aider and abettor may be convicted only if he has the requisite mental state for the offense, there was no obvious error in the aiding and abetting instruction given in appellants' trial as it related to ADW. That mental state, as we have said, is that the aider and abettor be "aware" of the principal's use of the weapon because it was

"reasonably foreseeable" that the principal would use a dangerous weapon. In appellants' trial, in addition to the "natural and probable consequences" language, the instructions told the jury that to be "legally responsible for the principal's use of a weapon during an offense ... the aider and abettor [must have] had actual knowledge that some type of weapon would be used or ... it was reasonably foreseeable to the aider and abettor that some type of weapon was required to commit the offense." Here, where the "dangerous weapon" was a shod foot used to kick Rogers in the head and side of his body, the jury was instructed that a dangerous weapon is "any object likely to produce death or great bodily injury by the use made of it." Viewed as a whole, the instructions fairly apprised the jury that accomplice liability required a determination that appellants either actually knew or that it was reasonably foreseeable to them that the principal would use a shod foot to kick Rogers. Thus, the trial court did not plainly err in instructing the jury as it did with respect to aiding and abetting ADW.[26]

C. *Aggravated Assault (While Armed)* [27]

■ While most of the statutorily defined categories of assault recognized in the District of Columbia were created by Congress in 1901, see *supra* note 19, the crime of aggravated assault was not created until 1994, when the Council of the District of Columbia enacted the Omnibus Criminal Justice Reform Amendment Act of 1994, D.C. Law 10–151 (Aug. 20, 1994). Aggravated assault requires that the victim of the assault suffer "serious bodily injury." D.C.Code § 22–404.01(a); *see Nixon v. United States,* 730 A.2d 145, 150 (D.C.1999). The fact of serious bodily injury, however, is not by itself sufficient for conviction. The statute requires, in addition, a *mens rea* element of the person causing serious injury. A person will be guilty of the offense if:

(1) By any means, that person *knowingly or purposely* causes serious bodily injury to another person; or

(2) Under circumstances manifesting *extreme indifference* to human life, that

26. We have repeatedly said that an aider and abettor is responsible for the principal's use of a weapon if he either knows, or it was reasonably foreseeable, that the principal would use a dangerous weapon. Many of these statements have been *dicta*. *See, e.g., Guishard v. United States,* 669 A.2d 1306, 1314 (D.C.1995) (armed offense; evidence established guilt as principal); *Abdus–Price v. United States,* 873 A.2d 326, 332–33 (D.C. 2005) (assault with intent to commit robbery while armed; no conviction of "while armed"). As we noted in *Ingram,* we have not analyzed in depth various aspects of the "reasonable foreseeability" element as it applies to aiding and abetting armed offenses. *See* 592 A.2d at 1001–03 n. 14 and 15. Application of this concept may need special consideration and instruction where the "dangerous weapon" is defined by its manner of use by the principal, as in the case of shod feet—which may (or may not, depending on the circumstances) be more or less foreseeable by the accomplice. We also have not evaluated

the "reasonable foreseeability" standard since *Wilson–Bey,* where we remarked that (at least in the context of first-degree murder) "a negligence-based approach contravenes basic notions of criminal responsibility." 903 A.2d at 837. On plain error review, however, it is unnecessary to consider or decide any of these issues.

We note that since *Wilson–Bey* was decided, the standard Red Book instruction has been revised to provide that for accomplice liability with respect to a principal's use of a weapon, the government must prove "beyond a reasonable doubt that the aider and abettor had *actual knowledge* that some type of weapon would be used to commit the offense." Criminal Jury Instructions for the District of Columbia, No. 4.02 (4th ed. 2007) (emphasis added).

27. The foregoing discussion with respect to aiding and abetting ADW applies to the while armed element of aggravated assault.

person *intentionally or knowingly* engages in conduct which creates a grave risk of serious bodily injury to another person, and thereby causes serious bodily injury.

D.C.Code § 22–404.01(a) (emphasis added).[28]

■■■ In applying these provisions, we have, for the most part, merely tracked this statutory language, without parsing its elements with respect to the mental state necessary for conviction. *See, e.g., Frye,* 926 A.2d at 1095; *Owens v. United States,* 982 A.2d 310, 316 (D.C.2009); *In re D.E.,* 991 A.2d 1205, 1210 (D.C.2010). A plain reading of the two provisions makes clear that each has a *mens rea* requirement: subsection (a)(1) proscribes conduct that is performed "knowingly or purposely"; subsection (a)(2) proscribes conduct that is performed "intentionally or knowingly" and "[u]nder circumstances manifesting extreme indifference to human life." Under subsection (a)(1), the prohibited conduct may be performed "[b]y any means," so long as it "causes" "serious bodily injury to another person." Under subsection (a)(2), the actor must engage in "conduct" that "creates a grave risk of serious bodily injury to another person, and thereby causes serious bodily injury."

From the relatively lean legislative history of § 22–404.01, it appears that its purpose was to build on the common law of

assault, but to adapt it for the cases where there is heightened culpability and serious bodily injury results. As the Committee Report accompanying the act indicated, the crime of aggravated assault was meant to penalize certain egregious forms of assault more severely:

> The new crime of aggravated assault has been created. Under current law, the District does not have a felony assault statute. This new assault statute would cover those cases where the person knowingly and recklessly causes serious bodily injury to another person. Currently all assaults are prosecuted under the simple assault statute, more than 4600 cases in 1992. A significant portion of those cases will now be prosecuted as felonies.

D.C. Council, Report on Bill 10–98 at 15 (Jan. 26, 1994).

■■■ The Committee Report reflects that before enactment of the aggravated assault statute, the universe of statutory assault crimes did not specifically address assaults that resulted in serious bodily injury.[29] Such assaults could not be charged as anything more than misdemeanor simple assault when there was no proof of the intent necessary to charge the offense as any of the "assault-with-intent-to" crimes, discussed *supra.* Just as when Congress codified the different types of

---

**28.** Aggravated assault is punishable by imprisonment for up to ten years, a fine of $10,000, or both. D.C.Code § 22–404.01(b).

The aggravated assault statute also includes a crime of *attempted* aggravated assault in subsection (c), a crime for which the government has no obligation to show that any bodily injury actually occurred. *See Frye,* 926 A.2d at 1096. Attempted aggravated assault is a felony punishable by up to five years, a fine of up to $5000, or both. D.C.Code § 22–404.01(c).

**29.** In order to prove mayhem or malicious disfigurement, which are punishable by im-

prisonment for up to ten years, there must be proof of "permanent [disabling] injury or disfigurement." *See Peoples,* 640 A.2d at 1054. In order to prove aggravated assault, which has a like penalty, there must be "serious bodily injury," which we have interpreted to require that the injuries to the victim "involve[d] a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss of impairment of the function of a bodily member, organ, or mental faculty." *Gathy,* 754 A.2d at 918 (quoting *Nixon,* 730 A.2d at 149).

serious assaults over a century ago to bridge the gap between the extremes of battery and mayhem, it must have struck the members of the Council that assaults resulting in serious bodily injury were not being appropriately addressed by the then-existing statutory scheme. The aggravated assault statute began to address this deficiency in the District of Columbia's scheme of assault offenses.[30]

Even though the language of the statute, viewed in the context of legislative history, clearly intended a heightened level of culpability—a *mens rea* requirement—we recognize that the language of subsection (a)(1) is susceptible to two readings. The phrase "knowingly or purposefully" may modify only the element of the crime that immediately follows (as in knowingly or purposely doing that act that "causes" serious bodily injury), or it may modify this element *as well as* the other elements in the rest of the subsection (as in knowing or intending that the conduct at issue cause serious bodily injury). Similarly in subsection (a)(2), the phrase "intentionally or knowingly" could be read as applying only to the conduct engaged in (the *actus reus*) or also to its capacity to create a "grave risk of serious bodily injury to another person."

Although we have not yet definitively addressed this ambiguity, we have suggested that the words "knowingly or purposely" in subsection (a)(1) might apply not only to the performance of conduct with the capacity to injure, but also to the consequences that flow therefrom. *See, e.g., Tolbert v. United States*, 905 A.2d 186, 189 (D.C.2006) (affirming AAWA conviction where "a reasonably minded juror could rely upon [the victim's] testimony ... that appellant intended to cause [the victim] serious bodily injury."). *We think* that is the most straightforward reading of the language in (a)(1), that the actor must intend ("knowingly or purposely") to cause serious bodily injury. The language of (a)(2) is more difficult to parse. It is possible to similarly read subsection (a)(2) as requiring that the actor must intent or know that his conduct "creates a grave risk of serious bodily injury to another person." But so read, subsections (a)(1) and (a)(2) would significantly overlap. As a matter of statutory construction, however, we do not lightly impose an interpretation that would effectively read out half of the statute. *See Thomas v. District of Columbia Dep't of Emp't. Servs.*, 547 A.2d 1034, 1037 (D.C.1988) ("A basic principle is that each provision of the statute should be construed so as to give effect to all of the statute's provisions, not rendering any provision superfluous."); *Tri–State Motor Corp. v. Standard Steel Car Co.*, 51 App. D.C. 109, 110, 276 F. 631, 632 (1921) ("[T]he conflict must be such as cannot be reconciled by construction. If it can be it is the duty of the court to do it—to har-

---

**30.** In 2007, the D.C. Council created another intermediate level of assault, for "unlawful[ ] assault[ ] or threaten[ing] another in a menacing manner, and intentionally, knowingly, or recklessly caus[ing] significant bodily injury to another...." D.C.Code § 22–404(a)(2) (Supp.2008). "Significant bodily injury" is defined as "injury that requires hospitalization or immediate medical assistance." *Id.* The offense is punishable by up to three years' imprisonment, or a fine of $3,000, or both. *Id.* As explained in the accompanying Committee Report, this change was intended to "create a three-tiered assault scheme." D.C.

Council, Report on Bill 16–247 at 5 (Apr. 28, 2006). The Report explained further:

> Under this scheme, a simple assault would be one that does not require any physical injury and a perpetrator of simple assault is subject to imprisonment of not more than 180 days. The "enhanced" assault would require significant (but not grave) bodily injury and be subject to a term of imprisonment of not more than 3 years. This provision would fill the gap between aggravated assault and simple assault.

*Id.* at 5–6.

monize and sustain, not destroy."). In order to give effect to the statute as a whole, subsection (a)(2) must be read as requiring a different type of mental element—gross recklessness—as shown by "intentionally or knowingly" engaging in conduct that, in fact, "creates a grave risk of serious bodily injury," and doing so "under circumstances manifesting extreme indifference to human life." This interpretation is supported by the Committee Report's use of the words "knowingly and *recklessly* " in describing the two-part aggravated assault statute. D.C. Council, Report on Bill 10–98 at 15 (Jan. 26, 1994).

 Therefore, in order to prove aggravated assault under subsection (a)(1) of D.C.Code § 22–404.01, the government needs to show, beyond a reasonable doubt, that the defendant had the intent "knowingly or purposely" to cause serious bodily injury; or, under subsection (a)(2), the government must show, beyond a reasonable doubt, that the defendant engaged in conduct, "intentionally or knowingly," that in fact created "a grave risk of serious bodily injury," and did so with "extreme indifference to human life." [31]

 In light of the *mens rea* required for aggravated assault, the principles established since *Wilson–Bey* mandate that when the government prosecutes a defendant under an aiding-and-abetting theory of criminal liability, in addition to proving that the aider and abettor "participated" in the assault, the government must prove also that the aider and abettor himself intended to cause serious bodily injury or

acted with extreme indifference to human life because he knew either that the principal would commit an assault with such intent, or that the principal would intentionally engage in an assaultive act that actually created a grave risk of serious bodily injury. Where serious bodily injury is actually caused, the accomplice is guilty of aggravated assault, D.C.Code § 22–404.01(a)(1) & (2); if not, the offense is attempted aggravated assault, *id.* at (c).

 Applying these principles to the appeals before us, we conclude that the aiding and abetting instruction in appellants' trial was insufficient to convey to the jury that to convict appellants as aiders and abettors, they must be found to have had the requisite *mens rea* element of aggravated assault. The instruction allowed conviction of aggravated assault as aiders and abettors if appellants participated in "a crime" or "the crime," but specifically told jurors that appellants did not need to have the intent "to commit the particular crime committed by the principal offender." In short, that appellants could be liable for aggravated assault for negligently having begun a simple assault if it was "natural and probable" that the melée would escalate to severe kicking by someone else, even if appellants did not themselves have the intent to cause serious bodily injury or "manifest[ ] extreme indifference to human life." The aiding and abetting instruction therefore allowed the jury to find appellants guilty of aggravated assault without a *mens rea* element

**31.** The trial court properly instructed the jury as follows:

The essential elements of the crime of aggravated assault while armed ... are: One, that the defendant caused serious bodily injury to Jarrell Rogers.

Two, that the defendant either, A, intended to cause serious bodily injury to Jarrell Rogers; or B, knew that serious bodily injury to Jarrell Rogers would result from his

conduct; or C, intentionally or knowingly engaged in conduct which created a grave risk of serious bodily injury to Jarrell Rogers and which manifested an extreme indifference to human life.

Three, that at the time of the offense, the defendant was armed with or had readily available a dangerous or deadly weapon. Appellants do not challenge these instructions.

■■■■■■■■■■■■■

required by the statute; all the government had to prove were the less rigorous elements of simple assault, which in this case were defined for the jury as "voluntarily and on purpose" causing a physical injury to Rogers, "however small," or of ADW, which as we have discussed in the previous section, could be based on only a "reasonable foreseeability" that the assault would involve a dangerous weapon. Because "the instruction in this case omitted the *mens rea* element of the offense[s] charged, the error was of constitutional magnitude." *Wilson–Bey,* 903 A.2d at 822.

## IV. Plain Error Review

■■■■■ Appellants did not raise their claim of instructional error at trial, and our review is therefore for plain error. *See Thomas v. United States,* 914 A.2d 1, 8 (D.C.2006). To obtain reversal of a conviction under plain error review, an appellant must show (1) error, (2) that is plain or clear, and (3) that affects substantial rights; if the appellant meets this burden, then the court may exercise its discretion to reverse if the error (4) seriously affects the fairness, integrity or public reputation of judicial proceedings. *See United States v. Olano,* 507 U.S. 725, 732–36, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

■■■■■ As discussed in the previous section, the aiding and abetting instruction omitted a necessary element for conviction of aggravated assault. To establish error that is clear, the error usually must have been obvious to the trial judge. However, "where the law at the time of trial was settled and clearly contrary to the law at the time of appeal—it is enough that an error be 'plain' at the time of appellate consideration." *Johnson v. United States,* 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997); *accord, Clarke v.*

*United States,* 943 A.2d 555, 556 (D.C. 2008). This is the standard we have applied to erroneous aiding and abetting instructions given without objection prior to *Wilson–Bey. See Kidd v. United States,* 940 A.2d 118, 127 (D.C.2007). In this opinion, we have clarified that both prongs of the aggravated assault statute require an element of *mens rea:* either specific intent to cause serious bodily injury, or, as the plain terms of the statute provide, "extreme indifference to human life." In *Wilson–Bey* we held that the aiding and abetting instruction given here was inadequate where the statute required proof of specific intent, as does the first prong of the aggravated assault statute. We have extended *Wilson–Bey's* reasoning to second-degree murder which, like the second prong of aggravated assault, can be proven by evidence of "conscious disregard of an extreme risk of death or serious bodily injury." *Coleman,* 948 A.2d at 553 (quoting *Comber v. United States,* 584 A.2d 26, 38, 43 n. 19 (D.C.1990)); *see Comber,* 584 A.2d at 38–39. Because, as Judge Farrell notes in his concurrence, the two are "substantively indistinguishable," see *post* at 45, the law at the time of this appeal is settled and clearly contrary to the law at the time of trial. Thus, appellants meet the first two prongs of plain error review, error that is clear.[32]

■■■■ The question is closer with respect to prejudice. We must determine whether the instructional error affected appellants' substantial rights. To meet this third prong of plain error review, it is appellants' burden to show a "reasonable probability" of a different outcome if the jury had been properly instructed. *United States v. Dominguez Benitez,* 542 U.S. 74, 81–2, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004); *United States v. Bagley,* 473 U.S.

---

**32.** In this case, "clear error" is a term of art, and does not suggest that the trial judge acted

incorrectly.

667, 681 n. 12, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). In determining whether there is a reasonable probability, ·

> [t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worth of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). In this case, where the erroneous instruction omitted the *mens rea* element of the offense of aggravated assault, the question is whether it is "reasonably probable (and not merely possible) that the jury would have harbored a reasonable doubt" about appellants' guilt if it had been properly instructed on the *mens rea* element of accomplice liability. *Heath v. United States,* 26 A.3d 266, 280 (D.C.2011).

How probable is it that the jury in this case, if correctly instructed, would have harbored a reasonable doubt of appellants' guilt? Several factors make it probable. At trial the main factual dispute was whether appellants participated throughout the fight to its conclusion, as Rogers and Gelim testified; or whether they left after Reginald pulled Darrell out of the fight, as Reginald and Davenport testified, *before* someone hit Rogers with a bottle and knocked him to the ground when the vicious kicking took place. Thus, there was evidentiary support for reasonable doubt, depending on whose testimony the jury believed.[33]. The jury did not have to resolve this conflict in the evidence, however, in order to convict appellants under the

"natural and probable consequences" language of the faulty aiding and abetting instruction. Even allowing for the possibility that the jury did not believe that appellants left altogether, but hung around, the jury was spared having to determine whether it was appellants who kicked Rogers with their own shoes, and therefore were guilty as principals; or whether someone else in the group did so but they participated and—crucially for aggravated assault—had a similar intent to seriously injury Rogers or acted with "extreme indifference" to Roger's plight at the hands (or feet) of others in the group. A properly instructed jury would have had to address and resolve these questions in order to convict appellants of aggravated assault as aiders and abettors. Under the instruction that was given, however, it would have been enough that appellants started the fight, which then led the group of men to join the scuffle and escalate it to a vicious kicking of Rogers.

How probable is it that appellants were convicted as accomplices rather than as principals? The government argues that the deficient instruction did not prejudice appellants because its case did not place primary reliance on aiding and abetting liability, and that Gelim's testimony that appellants "stomped" on Rogers was more than sufficient to convict them as principals. Sufficiency is not the proper measure, however; the question is whether there is a "reasonable probability" that the jury's verdict would have been swayed by the erroneous instruction to convict appellants as aiders and abettors. *Thomas,* 914 A.2d at 21. We believe there is. In closing argument, the prosecutor emphasized Gelim's testimony that appellants had kicked and stomped on Rogers, consistent with opening statement, that appellants

---

**33.** As discussed *infra,* the verdict reveals that the jury discounted at least part of Gelim's

testimony.

had been principals during the entire attack. The defense's closing argument responded by attacking Gelim's credibility based on inconsistencies in her testimony between the first and second trials, as well as for bias because she admitted she wanted "revenge" for the attack on Rogers. Defense counsel pointed, instead, to Reginald's and Davenport's testimony that appellants had left after the initial scuffle, before the serious kicking of Rogers took place. Counsel for Reginald argued that when Reginald left the scene, "Rogers was still talking trash and still acting wild and what happened? After [Reginald] left the scene is not what you can hold him responsible for." Counsel for Darrell similarly argued that Darrell "cannot be held accountable for what those people did. He didn't know those people. He didn't know what those people were going to do to Mr. Rogers. He didn't tell those people to do what they did to Mr. Rogers."

In rebuttal, the prosecutor addressed appellants' claim that they had left the fight before it turned ugly:

> [T]his was a major fight involving a lot of people, including the two defendants and their unnecessary, brazen attack on Jarrell Rogers.
>
> The court will give you some instructions, and one of them is aiding and abetting. What's important to note here is that a defendant aids and abets in committing a crime—you must find that the defendant knowingly associated himself with the commission of the crime. Reginald Perry, coming down that street, throwing a punch. Darrell Perry, coming to his brother's aid, trying to kick or punch Jarrell Rogers. That he participated in the crime as something he wished to bring about; that he intended by his actions to make it succeed.
>
> Did they succeed? You bet they did. They succeeded in stomping Jarrell Rogers into the ground. . . .

> Finally, this group dynamic. The defense wants you to separate Reginald Perry and Darrell Perry from the group of others that apparently beat Jarrell Rogers after they left.
>
> They acted in concert: They acted as a group. When the fight was over—we know that also because of Reginald Perry's testimony from September 30th, when he said they were still swinging. He's still in the middle of that battle, along with the other men. They were all still swinging on Jarrell Rogers, they're all still attacking, he's in that group, until his brother pulls him out.
>
> By then the damage had been done.

In rebuttal, in other words, the prosecutor shifted to aiding and abetting liability, in order to respond to the defense's argument that Gelim was not credible and that appellants had left the fight before the kicking began. Moreover, although the import of the prosecutor's argument is not without ambiguity, it underscored the deficiencies in the aiding and abetting instruction by implying that appellants were responsible for all that ensued because they started the fight. It is telling that the specific actions of appellants identified by the prosecutor refer only to the beginning of the fight: Reginald's "coming down the street, throwing a punch"; and Darrell's "coming to his brother's aid, trying to kick or punch" Rogers.

The defense's closing argument and the prosecutor's rebuttal appear to have had the effect of focusing the jury on the aiding and abetting theory of liability. Perhaps hoping to avoid having to resolve the conflicting accounts about the extent of appellants' participation, during deliberations the jury sent a note asking "how far does it [aiding and abetting] go?"; another note quickly followed, declaring that the jury was "deadlocked." The judge responded to the first note by re-reading the

defective aiding and abetting instruction, including the "natural and probable consequences" language and the admonition that "it is not necessary that the defendant had intended to commit the particular crime committed by the principal offender." After reinstruction, the jury that had just declared itself deadlocked returned a guilty verdict in half an hour. Thus, the record supports that the jury in this trial relied on the erroneous instruction to convict appellants of aggravated assault. In the first trial, on the other hand, where a mistrial was declared because the jury could not come to a verdict, the prosecutor did not similarly argue that both appellants should be found guilty of aggravated assault as accomplices, only as principals.[34]

■ It is of course impossible for judges to divine with certainty the jury's subjective thinking; our appellate responsibility is to determine whether there is a reasonable probability that a "rational jury" improperly relied on an erroneous instruction to convict. *See White v. United States*, 613 A.2d 869, 877 & n. 18 (D.C. 1992) (en banc) ("The answer to this inquiry comes not from a subjective inquiry into the jurors' minds, but rather from an analysis of the instructions given to the jury and the presumption that jurors follow instructions."). Thus, our task is to make sense of the jury's verdict in light of the evidence presented and the instructions given to the jury, and, where available, the jury's expressions of its questions about the evidence or the law. Inferences can then be drawn about the likely impact of the erroneous instruction. In this case, deadlocks in two separate trials tell us that juries in both trials had difficulty convicting appellants as principals. That difficul-

ty, it appears, likely was resolved the second time around by focusing on the aiding and abetting instruction. Here, where the jury in this second trial acquitted Reginald of ADW (bottle) even though Gelim testified that Reginald hit Rogers with a bottle, the jury may well have harbored doubt about Gelim's testimony that Darrell and Reginald participated in the kicking assault, yet convicted them as aiders and abettors once instructed (and in response to a query, reinstructed) in a manner that relieved the government of the need to prove that they had the required *mens rea* to inflict serious bodily injury. This is a case, in other words, where our confidence in the outcome of the trial is necessarily undermined, and we conclude that appellant's substantial rights were affected. *Cf. Wilson v. United States*, 785 A.2d 321, 328 (D.C.2001) (concluding that substantial rights were not affected where the jury "sent no note" and there was "not even a hint that the jury misunderstood the elements of aggravated assault, or that the instruction given as to [aiding and abetting] aggravated assault while armed mislead or confused the jury.").

■ With respect to the final prong of plain error review, we have said that a constitutional error of this magnitude, that goes to the essence of the crimes charged, "seriously affects the fairness and integrity of the proceedings." *See Drayton v. United States*, 877 A.2d 145, 149 (D.C.2005). In *Johnson,* the Supreme Court addressed a case where an element of the offense (materiality of the false statement in a perjury trial) was omitted from the jury charge. On review for plain error, the Court determined that the forfeited instructional error did not seriously

---

**34.** The one instance—a single sentence in closing—where the prosecutor mentioned accomplice liability was with respect to Darrell Perry: "[I]s there any doubt in your mind that Darrell Perry aided and abetted his

brother and the others beating Jarrell Rogers with that bottle, forcing him down on that ground, kicking and stomping Jarrell Rogers?" Darrell was acquitted of ADW (bottle) in the first trial.

affect the fairness and integrity of the proceedings where the evidence supporting materiality was "overwhelming" and the element omitted from the charge was "uncontroverted." 520 U.S. at 470, 117 S.Ct. 1544. The same cannot be said here, where the evidence about appellants' participation in the kicking assault was controverted by the testimony of two defense witnesses, and appellants have presented a "plausible argument," *id.,* that they may have been wrongly convicted of aggravated assault on an aiding and abetting theory of liability, without a jury determination that they had the *mens rea* required for conviction of that offense. In circumstances where an essential element of the offense is thus contested and has not been found by the jury, "[a] wrongful conviction necessarily affects the integrity of this proceeding and impugns the public reputation of judicial proceedings in general." *Pérez v. United States,* 968 A.2d 39, 96 (D.C.2009); *cf. Wilson,* 785 A.2d at 327 (distinguishing an omitted element from an omitted definition).

Because "the law at the time of trial was settled and clearly contrary to the law at the time of appeal," *Johnson,* 520 U.S. at 468, 117 S.Ct. 1544, and appellants have met the required showing of substantial prejudice with respect to an essential element of the offense of which they were convicted, we therefore exercise our discretion and reverse appellants' convictions for AAWA and remand the case for further proceedings. We affirm the convictions for simple assault and ADW.

*So ordered.*

FARRELL, Senior Judge, concurring in part and concurring in the judgment:

I agree with Judge Ruiz, for the reasons stated below and substantially for those stated in parts III. C. and IV. of her opinion, that appellants' convictions for AAWA must be reversed. I also agree, as indeed we all do, that appellants' convictions for ADW must stand, but because I consider it unnecessary to engage in, and do not entirely endorse, the extended analysis contained in parts II and III. A. and B. of Judge Ruiz's opinion, I concur in the result as to those convictions.

## I.

*Wilson–Bey*[1] announced the principle that "where a specific *mens rea* is an element of a criminal offense, a defendant must have had that *mens rea* himself to be guilty of that offense, whether he is charged as the principal actor or as an aider and abettor." *Kitt v. United States,* 904 A.2d 348, 356 (D.C.2006). Thus an instruction merely imputing that *mens rea* to an accomplice because he is responsible for the acts of others naturally and probably consequent upon, or reasonably foreseeable from, his own conduct is improper. *Wilson–Bey,* 903 A.2d at 838 ("[I]t serves neither the ends of justice nor the purposes of the criminal law to permit an accomplice to be convicted [of premeditated murder] under a reasonable foreseeability standard when a principal must be shown to have specifically intended the decedent's death and to have acted with premeditation and deliberation....").

*Wilson–Bey* dictates that it is error—clear and obvious error, *United States v. Olano,* 507 U.S. 725, 734 (1993)—to give the "natural and probable consequences" instruction in a prosecution for aiding and abetting an aggravated assault. That statute[2] requires proof, beyond a reasonable

---

1. *Wilson–Bey v. United States,* 903 A.2d 818 (D.C.2006) (en banc).

2. Under D.C.Code § 22–404.01(a) (2001), a person commits aggravated assault if:

doubt, that the defendant either "knowingly or purposely" intended to cause serious bodily injury, § 22–404.01(a)(1), or, at the least, "intentionally or knowingly" engaged in conduct that in fact created "a grave risk of serious bodily injury" and he did so with "extreme indifference to human life." Section 22–404.01(a)(2). The latter *mens rea* is substantively indistinguishable from the minimum state of mind required for conviction of second-degree murder,[3] and *Wilson–Bey's* prohibition, we have held, applies to the latter crime. *Coleman v. United States*, 948 A.2d 534, 552–53 (D.C. 2008). An accomplice thus may not be found to have had the heightened, *i.e.*, specific or otherwise "malicious," intent to cause serious bodily injury with the instructional help of a natural and probable consequences standard.

*Wilson–Bey's* applicability is much more problematic with respect to ADW, which under our decisions requires neither a " 'specific *mens rea*," *Kitt*, 904 A.2d at 356, nor malice by the principal offender but only the intent to do the assaultive act combined with use of a dangerous weapon. *See Sousa v. United States*, 400 A.2d 1036, 1044 (D.C.1979) ("[T]he 'specific intent to inflict … injury with the weapon is not a necessary element of assault with a dangerous weapon' "); *Price v. United States*, 813 A.2d 169, 175 (D.C.2002) (the elements of ADW include those of simple assault plus the defendant having "committed the assault with a dangerous weapon"). Given the long series of our decisions characterizing ADW, like simple assault, as a "general intent crime," *see, e.g., Smith v. Unit-*

*ed States*, 593 A.2d 205, 206–07 (D.C.1991), it is not obvious that *Wilson–Bey's* bar to an instruction letting the jury infer an accomplice's intent from acts naturally and probably consequent upon his own applies to a prosecution for ADW, particularly shod foot assault. That issue must be left to another case, and so appellants' ADW convictions stand.

## II.

The issue of prejudice—or effect on appellants' "substantial rights"—from the erroneous instruction as to AAWA is a very close one. While an unobjecting defendant's burden on appeal to show a "reasonable probability" of a different outcome does not require him to "prove by a preponderance of the evidence that but for the error things would have been different," *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n. 9, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004), the standard is not toothless; like the clear-or-obvious error prong of *Olano*, it has "some 'bite.' " *Puckett v. United States*, 556 U.S. 129, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009); *see Strickler v. Greene*, 527 U.S. 263, 291, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (in context of alleged violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), explaining that while "[t]he District Court was surely correct that there is a reasonable *possibility* that [the withheld evidence] might have produced a different result," petitioner's "burden is to establish a reasonable *probability* of a different result.") (Emphasis in original.)

---

(1) By any means, that person *knowingly or purposely* causes serious bodily injury to another person; or
(2) Under circumstances manifesting extreme indifference to human life, that person *intentionally or knowingly* engages in conduct which creates a grave risk of serious bodily injury to another person, and thereby causes serious bodily injury.

(Emphasis added.)

**3.** *See Comber v. United States*, 584 A.2d 26, 39 & n. 11 (D.C.1990) (defining "malice" for purposes of conviction of second-degree murder to include "extreme recklessness" regarding risk of death or serious bodily injury).

Here, beyond the reasonable chance that the jury ultimately looked past the aiding and abetting instruction and convicted appellants as principals—as actual kickers of the victim—there is the additional question of whether jurors probably relied on the forbidden portions of the instruction rather than on other, classic and unimpeachable, parts of the same jury charge. They may have done the latter if they rejected both the defense's and the prosecution's polar-opposite accounts of what had happened and instead—finding the truth to be in-between—were satisfied that appellants had remained on the scene, supportively, long enough to witness the aggravated assault even if they did none of the kicking themselves.

Nonetheless, if only a single juror had difficulty resolving just what the facts were—*i.e.*, which version to believe or how much of it—and resorted to the crutch of an instruction making irrelevant whether appellants had even "knowingly associated [themselves]" with the kicking, appellants' trial on the AAWA charge was unconstitutionally flawed. I conclude there is a reasonable probability that one or more jurors, accepting the twice-given instructional invitation to take the easy path, found it unnecessary to resolve the key factual disputes in the case, and that this compromised the basic fairness of appellants' trial on the AAWA charge.

PRYOR, Senior Judge, concurring in part, and dissenting in part:

The questions presented in this appeal, on plain error review, are narrow and straightforward.

### I.

In circumstances where complainant, his fiancée, and two children were walking along a street, they passed a group of men which included the two appellants, who are brothers. Complainant recognized the brothers and unpleasant, menacing words were exchanged. The scene quickly turned violent when complainant was struck on the head with a bottle, causing him to fall to the ground. His fiancée testified that she saw one of the brothers kick the complainant—while he was on the ground—multiple times. She also stated that she saw the other brother jump on complainant's head multiple times like a "trampoline." In addition to questions of self-defense, appellants contended they were no longer present when the kicking occurred.

At an earlier trial which ended without a verdict, the jury was instructed, among other things, that an aider and abettor was culpable and responsible for the natural and probable consequences of his acts. At the second trial (the source of this appeal) there was little discussion and no objection by either side to the repetition of the same instruction. At the second trial, the nature of the prosecution's evidence is fully described in the majority opinion. In the context of the larger group that was present at the scene of the altercation, the prosecutor argued that appellants could be deemed aiders and abettors in the offenses charged. During deliberations the jurors requested clarification of the accomplice instruction. Ultimately, the jury found appellants guilty of aggravated assault while armed and assault with a dangerous weapon. In this appeal, notwithstanding that there was no objection in the trial court on this issue, it is urged, for the first time, that the aiding and abetting instruction given did not conform to our *Wilson–Bey* opinion.[1] In general, we held in that decision that one convicted as an accomplice to an offense must be shown to have had substantially the same *mens rea* as that required of the principal. *Id.* at 838.

1. *Wilson–Bey v. United States,* 903 A.2d 818 (D.C.2006) (en banc).

Thus our review in this instance is certainly for plain error as to the convictions before us.

## II.

With regard to the aggravated assault offense, I think that Section (1) of the statute requires an intent to do assaultive acts with intent to "cause serious bodily injury." Section (2) of the statute can be violated, alternatively, by "... conduct which creates a grave risk of serious bodily injury to another person...." We are in agreement that the instruction given, and later repeated, respecting aiding and abetting was in error. Thus on plain error review appellants must show that the error was plain, obvious and that there is a reasonable probability that the error caused unjust prejudice in the proceedings. On appeal, the primary challenge is that the instruction describing the intent requirement for accomplice responsibility, using "the natural and probable" language—especially when repeated—served to mislead or confuse the jury and perhaps increased the prospect of a compromise verdict.

In this instance the elements of the statute are not complex; that is particularly so of the mind set of a person accused of this offense. There must be the intent to cause serious injury or to do so by means of reckless behavior. Of course, this case presented a range of factual questions for the jury to resolve. Depending on the jury's credibility findings, appellants could have been acquitted if the jury found they were not present when the complainant was attacked while on the ground; or they could find them to be aiders and abettors; or they could simply find appellants guilty as principals, based on the testimony of complainant's fiancée. By design, we do not know and can not know the path of the jury's deliberations. In my view this historic separation between lawyering and jury factfinding is at the heart of this issue. Appellants' contention of error rests on the premise that appellants were convicted as aiders and abettors and thus were mislead by a faulty instruction; but the jury was not limited to that theory of the case and was free to decide otherwise. We cannot speculate. Rather, in light of all of these variables, appellants—to prevail on plain error—must show that the "natural and probable" instruction, in the circumstances of this case, caused a reasonable *probability* of unjust prejudice to appellants. They have not met that standard and I therefore would affirm the convictions.

As to the assault with a deadly weapon convictions, I would not reverse. The *mens rea* is the same as in simple assault. It is merely an intent to do an assaultive act. In the instance of the felony, assault with a weapon, the legislature has simply enhanced the range of penalty where a weapon is used; there is no change in the *mens rea*. In the circumstances of the present case the factual determination by the jury is clearer and I can see no plain error reason to disturb it. The challenged probability of unfairness attributable to the instruction is minimal and I therefore would not reverse the assault with the dangerous weapon convictions.

I write separately because on plain error review, I do not adopt the broader declarations rendered here and disagree with the reversal of the convictions for aggravated assault while armed.