*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-FS-1347

IN RE D.P., APPELLANT

Appeal from the Superior Court
of the District of Columbia
(DEL-2275-12)

(Hon. Florence Y. Pan, Trial Judge)

(Argued May 14, 2015                                    Decided August 13, 2015)

*Aaron Marr Page*, with whom *Randy Evan McDonald* was on the brief, for appellant.

*John D. Martorana,* Assistant Attorney General, with whom *Eugene A. Adams*, Interim Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, *Rosalyn Calbert Groce*, Deputy Solicitor General, and *John J. Woykovsky*, Assistant Attorney General, were on the brief, for appellee.

Before FISHER and EASTERLY, *Associate Judges*, and FARRELL, *Senior Judge*.

EASTERLY, *Associate Judge*:     As sixteen-year-old D.P. was traveling home from school on a crowded Metrobus, she and two girlfriends started a fight with M.G., another girl from a different high school. The entire incident was captured on video by the Metrobus camera. From start to finish, the fight lasted approximately fourteen seconds. D.P. and her friends pushed through other passengers standing in the aisle to get at M.G., exchanged blows with M.G., and

then got off the bus. M.G. stood her ground for most of the incident but, at the very end, disappeared from view. Apparently, she hit her head on a pole, and she was knocked unconscious. A friend of M.G.'s helped her into a seat, where she quickly revived. Minutes later, M.G. walked off the bus and declined to go to the hospital.

One of D.P.'s friends pled out to simple assault, a misdemeanor, and the other friend's case was apparently never adjudicated. But D.P. went to trial. The trial court adjudicated her delinquent after finding her involved in the most severe form of assault in the District, aggravated assault, as well as its lesser included offense, assault with significant bodily injury, both felonies. D.P. now appeals, arguing that the evidence was insufficient to support a finding of her guilt of (or involvement in) either crime. We agree.

Fights on public transit are unquestionably a cause for concern, and D.P.'s actions cannot be condoned, but D.P. did not engage in felonious conduct in this case. As to aggravated assault, the evidence is at the very least inadequate to demonstrate that D.P. possessed the requisite mens rea under the government's theory of the case: extreme indifference to human life, equivalent to the mental state required for second-degree murder. As to assault with significant bodily

injury ("felony assault"), M.G.'s minimal bruising and brief unconsciousness do not, under this court's binding precedent, amount to the kind of "significant" injury that would take this incident out of the realm of simple assault. Thus, we reverse and remand.

## I.   Facts[1]

Around 3:35 p.m. on September 27, 2012, sixteen-year-old D.P. boarded a Metrobus along with several other teenage companions, including codefendants M.P. and I.C. The group, identifiable as students from the same school by their matching school uniforms, filed onto the bus and seated themselves in the rearmost several rows. There, the schoolmates engaged in typical teenage socializing and horsing around. One student shared his snacks with M.P. and I.C.; another young man perched briefly on M.P.'s lap; and a third student showed off a dance move. D.P. and her schoolmates chatted and laughed, gestured across the aisle, and stood frequently to switch seats.

---

[1] The government presented the following facts via testimony from the complainant, M.G. and her companion on the day of the assault, H.A., and the display of video footage from the Metrobus's security camera. The government supplied a copy of this footage to the court. It shows video from the relevant timeframe from eight different vantage-points on the bus. The footage provides solely a visual record; there is no audio component.

Then, around 3:45 p.m., fifteen-year-old M.G. boarded the bus with H.A. and another group of teenagers; they were also wearing school uniforms, but theirs were different from those of D.P. and her companions. M.G. and her schoolmates moved to the center area of the articulated (double-length) bus. By this time, the bus was quite crowded, and there were no more seats available. M.G. and H.A. squeezed in alongside other standing passengers, holding onto the bus railings.

M.G. noticed D.P. and her friends in the back of the bus; she testified that they were being "loud," and were shouting for the students from M.G.'s school to come to the back of the bus. H.A. additionally testified that teenagers at the back of the bus were "yelling" that students from his and M.G.'s school were "bitches." Neither M.G. nor H.A. knew D.P. or her friends.

After about two minutes of this, at about 3:47 p.m., D.P. and her friends stood up and, moving single file—with M.P. in the lead, followed by D.P. and then I.C.—pushed their way to the center of the bus where M.G. stood. Seemingly without warning, M.P. punched M.G. in the face.

A brief scuffle ensued. M.P. continued to hit M.G., who tried to fight back as H.A. attempted to pull M.G. away. D.P. and I.C. also threw punches towards

M.G., but initially hit only air (or each other) until they were able to push past two women who were standing in the aisle and partially blocking their path. For the next several seconds, D.P. and her friends swung at M.G., but because of the crowded conditions it is difficult to see on the video where their blows landed. M.G. described that "we were just going back and forth," that she was "getting multiple hits," and that she "was hitting back," though she did not know whether any of her punches connected. Meanwhile, nearby passengers attempted to pull the girls apart or at least push them away.

After approximately fourteen seconds,[2] the fight ended just as quickly as it had begun. D.P. and the other girls turned around and made their way through the crowd to the rear door and exited the bus, which had come to a stop. About the same time, M.G. disappeared from the view of the camera. M.G. testified that she fell, hit her head on a pole, and briefly blacked out.[3] H.A. picked her up and

---

[2] The government represented at oral argument that it was "about an eighteen-second assault" but, in its brief, it specifically identified "14:47:54" as the time on the tape when M.P. threw the first punch, and "14:48:08" as the time when the fight broke up.

[3] In its brief, the government inconsistently argues that D.P. and her friends "continued the assault until M.G. was knocked unconscious," and that they "continued the assault even after [M.G.] fell to the floor." But the government never made the latter argument at trial and the trial court never made a finding that the assault continued after M.G. was knocked down. Based on our review of the

(continued…)

placed her, sitting upright, in an available seat. According to H.A., M.G. was unconscious for "maybe a minute, maybe less." M.G. testified that she came to "on the chair." A woman unbuttoned her shirt to help her breathe and directed the other passengers to give her some space. The crowd of passengers quickly thinned, bringing M.G. back into full view of the security camera.

About two minutes later, M.G. stood up and walked unassisted to the front of the bus where she sat down again, with H.A. beside her. The bus driver told M.G. that an ambulance had been called to take her to the hospital, but M.G. told the driver that she did not want to go. Two emergency medical technicians ("EMTs") subsequently entered the bus and spoke briefly to M.G. and H.A. before escorting them out the front door. M.G. testified that she went with the EMTs to their ambulance, where they "checked [her] blood pressure," "checked [her] head," and asked whether she was okay. From this examination, the EMTs apparently determined that M.G. did not need to go to the hospital, but they "made" her call her father.

---

(…continued)
videotape it is impossible to see whether D.P. and her friends continued to hit M.G. after she hit her head and fell to the ground, and there is no other evidence in the record to support the government's representation on appeal that they did.

The government presented no medical evidence regarding the nature of M.G.'s injuries, and M.G. provided no testimony that she had received any medical care after this incident. M.G. testified that "[t]he day after [she] had a headache," and that "for like two, two/three days" afterwards she experienced "minor headaches," but she did not go to the hospital. When asked if she had "any injuries, any swelling, anything at all" as a result of the incident, the only injury she identified was "the one when I first got hit, that's the only one I had," referring to the right side of her face where she had first been punched by M.P.

The government charged M.P., I.C. and D.P. with aggravated assault and assault with significant bodily injury. M.P. pled out to simple assault. There is no indication in the Superior Court docket that delinquency proceedings against I.C. were ever pursued. D.P. alone went to trial.[4]

The government's theory at trial was that D.P. was involved in both crimes as an aider and abettor, and the government and the court correctly understood that

---

[4] There appears to have been some miscommunication between the government and D.P.'s counsel regarding an offer to permit D.P. to plead guilty to simple assault; on the day of trial, counsel for D.P. indicated that D.P. was willing to plead guilty to this charge, but the government stated that the plea offer was no longer available.

the government was required to establish the same mens rea for D.P. as it would if she were the principal actor committing the offense.[5] The defense vigorously contested the sufficiency of the evidence with respect to D.P.'s mental state and the gravity of the injury M.G. suffered, both in a motion for a judgment of acquittal at the close of the government's case and in summation. Although the trial court indicated at one point that it thought the issue of mens rea for aggravated assault was "more of a close call," it ultimately rejected all of D.P.'s sufficiency of the evidence challenges and concluded that the government had proved D.P.'s involvement in both charged crimes beyond a reasonable doubt. This appeal followed.

## II.    Standard of Review

The only claims before us on appeal are challenges to the sufficiency of the evidence. We review sufficiency claims de novo, "view[ing] the evidence in the light most favorable to the prosecution, with due regard for the right of the . . . trier of fact[] to weigh the evidence, to determine the credibility of witnesses, and to draw reasonable inferences." *Nero v. United States*, 73 A.3d 153, 157 (D.C. 2013).

---

[5]  *See Perry v. United States*, 36 A.3d 799, 817 (D.C. 2011) (citing *Wilson-Bey v. United States*, 903 A.2d 818 (D.C. 2006)).

We will reverse if the evidence, so viewed, "is such that a reasonable juror must have a reasonable doubt as to the existence of any of the essential elements of the crime." *Teneyck v. United States*, 112 A.3d 906, 908-09 (D.C. 2015) (quoting *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc)).

### III. The Insufficiency of the Evidence to Support D.P.'s Conviction for Aggravated Assault

The District has a three-tiered classification system of assault. Simple assault is the lowest-level offense. A misdemeanor, it does not require that any actual injury be incurred and requires only general intent to perform the assaultive act.[6] Assault with significant bodily injury, commonly referred to as "felony assault," is the intermediate crime. As its name suggests, it requires the defendant to cause significant bodily injury and to do so "intentionally, knowingly, or recklessly."[7] Aggravated assault is the highest-level assault crime recognized in the District.[8] To obtain a conviction for aggravated assault, the government must prove that the defendant caused serious bodily injury to the victim and must prove

---

[6] D.C. Code § 22-404 (a)(1) (2012 Repl.); *see also Macklin v. United States*, 733 A.2d 962, 964 (D.C. 1999).

[7] D.C. Code § 22-404 (a)(2) (2012 Repl.); *see also Nero*, 73 A.3d at 158-59; *Quintanilla v. United States*, 62 A.3d 1261, 1263-64 (D.C. 2013).

[8] D.C. Code § 22-404.01 (2012 Repl.).

one of two qualifying mental states: that the defendant (1) caused this injury "knowingly or purposely," D.C. Code § 22-404.01 (a)(1), or (2) "[u]nder circumstances manifesting extreme indifference to human life, . . . intentionally or knowingly engage[d] in conduct which create[d] a grave risk of serious bodily injury to [the victim]," D.C. Code § 22-404.01 (a)(2).

D.P. argues that the government's evidence in this case was insufficient to establish her guilt for aggravated assault both because there was no proof that she caused M.G. a "serious bodily injury," and because there was inadequate proof that, manifesting extreme indifference to human life, she intentionally or knowingly created a grave risk of serious bodily injury under D.C. Code § 22-404.01 (a)(2).[9] We agree that the government's evidence fell far short of proving that D.P. possessed the state of mind set forth under this subsection for this most severe type of assault in the District of Columbia.[10]

---

[9] This was the only mens rea theory the government advanced at trial and the trial court accordingly determined that it was the only "basis the Government [had] s[ought] to proceed on" to establish D.P.'s involvement in the crime of aggravated assault. Because the evidence was clearly insufficient to show "know[ledge] or purpos[e]" under D.C. Code § 22-404.01 (a)(1), we limit our assessment of the sufficiency of the evidence to the second prong of the statute.

[10] In light of our conclusion that D.P. lacked the requisite mens rea for aggravated assault, we do not determine whether the complainant's brief loss of unconsciousness—from which she fully recovered without medical treatment and

(continued…)

Our analysis begins with *Perry v. United States*, 36 A.3d 799 (D.C. 2011). In that case, this court examined the mens rea element defined under subsection (a)(2) of the aggravated assault statute. Reasoning that aggravated assault was created by the Council of the District of Columbia to "penalize certain egregious forms of assault more severely," we determined that the mens rea for aggravated assault must reflect "heightened culpability." *Id.* at 815-16. With this understanding, we read the statutory requirements—that a defendant "intentionally or knowingly engage[] in conduct which creates a grave risk of serious bodily injury," and that the defendant do so "under circumstances manifesting extreme indifference to human life"—as requiring a showing of "gross recklessness." *Id*. at

---

(…continued)
which did not amount to significant bodily injury, *see infra* Part IV—amounted to serious bodily injury. *See Nixon v. United States*, 730 A.2d 145, 149 (D.C. 1999) (importing from Chapter 30 of the D.C. Code (addressing sex abuse crimes) the definition of serious bodily injury as that which "involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ or mental faculty"). *But see Swinton v. United States*, 902 A.2d 772, 775 (D.C. 2006) (describing serious bodily injury in the context of aggravated assault as "life-threatening or disabling" and explaining that, in prior cases where this court determined that the complainants had experienced such injury, they "typically required urgent and continuing medical treatment (and, often, surgery), carried visible and long-lasting (if not permanent) scars, and suffered other consequential damage, such as significant impairment of their faculties. In short, these cases have been horrific."); *see also Vaughn v. United States*, 93 A.3d 1237, 1269 n.39 (D.C. 2014) (questioning but not deciding whether any loss of consciousness, however brief, could amount to the requisite serious bodily injury to sustain an aggravated assault conviction).

817. We then said this mental state was "substantively indistinguishable" from the minimum state of mind required to prove second-degree murder, *id.* at 818; *see also id.* at 823 (Farrell, J., concurring), i.e., "such a wanton and willful disregard of an unreasonable human risk as to constitute malice aforethought," commonly known as "depraved heart malice." *See Comber v. United States*, 584 A.2d 26, 38-39 (D.C. 1990) (en banc) (reviewing the mental states that may support a conviction for murder).

As we explained in *Comber*, depraved heart malice can be properly inferred[11] from actions such as "firing a bullet into a room occupied, as the defendant knows, by several people; starting a fire at the front door of an occupied dwelling; shooting into a moving automobile, necessarily occupied by human beings; [or] playing a game of 'Russian roulette[.]'" *Id.* at 39 n.13. Evidence of such malice was "extremely strong" in *Powell v. United States*, 485 A.2d 596 (D.C. 1984), where the defendant led police officers on a chase down a highway at speeds exceeding ninety miles per hour, swerving across traffic lanes, driving on

---

[11] Inference is often necessary as "[i]t is the rare case where the defendant will clearly articulate his intent before he acts." *McKnight v. United States*, 102 A.3d 284, 287-88 (D.C. 2014) (citing *Jones v. United States*, 716 A.2d 160, 166 (D.C. 1998)).

the shoulder of the road, and ultimately crashing into a car stopped on a congested exit ramp.

The circumstances of this case are not analogous, and the trial court could not fairly infer beyond a reasonable doubt the "heightened culpability," *see id.* at 815, that aggravated assault requires. D.P. and her girlfriends did not act in a manner that manifested the requisite gross recklessness/depraved heart malice. D.P. and her friends were unarmed; they had no knives, no guns, and no other implements that could be recklessly employed. Their assaultive conduct was brief, lasting approximately fourteen seconds. A number of their blows did not even connect (at least not with M.G.). Their choice of venue meant that they would be on display and likely impeded in achieving any objective to injure M.G.—if not because concerned citizens would intervene to assist her, then because their fellow travellers would want to quickly quell the unrest to protect themselves. Indeed, it suggests that, more than inflicting injury, intimidation and harassment were their likely objectives. Without question, the fact that D.P. and her friends chose, seemingly on the spur of the moment, to stage their assault on a crowded bus evinces their general disregard for the safety and well-being of D.C. commuters, but that is not enough; it does not evince "extreme indifference to human life." *See*

*Johnson v. United States*, No. 13-CF-929, 2015 WL 3768986, at *5 (D.C. June 18, 2015) (explaining what mens rea the government must prove under D.C. Code § 22-404.01 (a)(2)).

The trial court determined, however, that it was enough that D.P. "participat[ed] in a group attack in which multiple blows were landed with force," and the government seeks to defend that ruling.[12] The trial court relied on *Owens v. United States*, 982 A.2d 310 (D.C. 2009), and *In re D.E.*, 991 A.2d 1205 (D.C. 2010). But *Owens* and *In re D.E.*, which predate *Perry* and its detailed analysis of the mens rea element of D.C. Code § 22-404.01 (a)(2), do not create any per se "group attack" rule for proving state of mind. Rather in *Owens* this court rejected appellant's sufficiency challenge to his aggravated assault conviction by examining the particular facts of the case: there, appellants struck the victim so many times and with such force that he died hours later as a result of "blunt impact with compression of abdomen, fractures of ribs, [and] injury to spleen, pancreas and

---

[12] The government also tries to argue that depraved heart malice is evident in this case as reflected by the fact that D.P. and her friends continued to beat M.G. after she was knocked unconscious, but as noted above, the record does not support this argument. *See supra* note 3.

stomach."[13]  982 A.2d at 312, 316-17.  And in *In re D.E.*, this court did not assess the sufficiency of the evidence of the appellant's mental state at all, because the appellant only challenged whether the victim's injuries "were insufficient to meet our standard for serious bodily injury."[14]  991 A.2d at 1210.

The incident captured in the Metrobus video is disturbing, and we do not mean to suggest that it was not a frightening experience for M.G.  But the scene of D.P. and her girlfriends throwing punches at M.G. for fourteen seconds and then walking away when M.G. was no longer fighting back, does not evoke the reckless disregard for human life or brutality we have held in other cases supported a conviction of aggravated assault.  Thus we conclude that the government failed to prove that D.P. possessed the requisite mental state to support her conviction on this charge.  Our holding is consistent with our three-tiered classification of assault

---

[13] Undoubtedly the conduct in *Owens* would have reflected depraved heart malice, but since we had not yet decided *Perry*, we did not specifically consider the point.  *Owens*, 982 A.2d at 317 (concluding only that appellants had "knowingly engag[ed] in conduct which created a grave risk of serious bodily injury").

[14] Nevertheless, *In re D.E.*, like *Owens* and *Perry*, reflects a level of wanton violence not seen in this case.  Appellant, with others, attacked the victim on a Metrobus and continued to beat her up after she fell onto the driver's seat.  D.E. then tried to pull the victim by her hair out of the bus driver's window; as the victim was partially hanging out of the window, her attackers continued to beat her, resulting in severe injuries, including a fractured nose, severe bruising to her face, and lasting damage to her vision.  *See* 991 A.2d at 1207.

crimes in the District, and reinforces the restricted application of aggravated assault to the worst cases where there is both "heightened culpability" at the level of gross recklessness/depraved heart malice and serious bodily injury results. *Perry*, 36 A.3d at 815-16.

## IV. The Insufficiency of the Evidence to Support D.P.'s Conviction for Felony Assault

D.P. additionally argues that the evidence was insufficient to establish that she was involved in the lesser included offense of assault with significant bodily injury.[15] Specifically, D.P. argues that M.G. did not suffer "significant bodily injury" as defined by statute and interpreted by this court.[16]

---

[15] *Medley v. United States*, 104 A.3d 115, 132 (D.C. 2014) (recognizing that assault with significant bodily injury is a lesser included offense of aggravated assault and citing *Collins v. United States*, 73 A.3d 974, 985 (D.C. 2013)).

[16] We must acknowledge a procedural oddity. Although the government vigorously argued in the trial court that D.P. could and should be convicted of felony assault, it did not respond to D.P.'s sufficiency challenge in its brief to this court, other than to assert that this conviction merges with D.P.'s aggravated assault conviction (an argument which presumes that there is a valid conviction to be merged). At oral argument, however, the court specifically inquired whether the government was conceding that it had failed to present sufficient evidence to support determination that D.P. was involved in an assault with significant bodily injury, and the government responded that it was not making any such concession. Thus we address this claim.

As discussed above, the District now has a three-tiered classification system for assault crimes, but for many years the government had only two choices when considering a prosecution for assault: simple assault or aggravated assault. The Council added the crime of assault with significant bodily injury in 2006 to "fill the gap"[17] between these two offenses and to provide a more appropriate response to assaults producing injuries that fall short of the "high threshold" required for aggravated assault, but which are still "significant" within the meaning of the statute. *See Jackson v. United States*, 940 A.2d 981, 986-87 (D.C. 2008); *see also Quintanilla*, 62 A.3d at 1263-64 (acknowledging that "the legislative intent was to provide a penalty for assault that results in significant (but not grave) bodily injury") (internal quotation marks omitted); *In re R.S.*, 6 A.3d 854, 859 (D.C. 2010) (explaining that in assessing whether the evidence was sufficient to support a conviction for felony assault, "[t]he focus . . . must be on the nature of the injury itself").

"Significant bodily injury" is defined in the felony assault statute as "an injury that requires hospitalization or immediate medical attention." D.C. Code

---

[17] Council of the District of Columbia, Comm. on the Judiciary, Report on Bill 16-247 at 6 (Apr. 28, 2006).

§ 22-404 (a)(2). This court's decisions in *Quintanilla v. United States*, 62 A.3d 1261 (D.C. 2013), and more recently in *Nero v. United States*, 73 A.3d 153 (D.C. 2013), *Teneyck v. United States*, 112 A.3d 906 (D.C. 2015), and *Blair v. United States*, 114 A.3d 960 (D.C. 2015), have further elucidated the nature of the injury required to sustain a conviction for felony assault by explaining what it means to "require[] . . . immediate medical attention." These decisions constitute binding precedent and dictate our decision in this case.

As interpreted by this court, "immediate medical attention" refers to "treatment"; in other words, "the 'attention' required . . . is not satisfied by mere diagnosis." *Quintanilla*, 62 A.3d at 1265. This treatment, in turn, "must be aimed at one of two ends—preventing long-term physical damage and other potentially permanent injuries or abating pain that is severe instead of lesser, short-term hurts."[18] *Teneyck*, 112 A.3d at 909 (citing *Nero*, 73 A.3d at 158). Such treatment must exceed "first-aid remedies such as ice packs, bandages, and . . . over-the-counter medications," *Teneyck*, 112 A.3d at 909, even if administered by a medical

---

[18] Similarly, "hospitalization" under the statute requires more than admission for outpatient care. *Teneyck*, 112 A.3d at 909 n.4; *see also In re R.S.*, 6 A.3d at 859 (explaining that "the fact that the treatment happened to be administered at a hospital is not determinative whether hospitalization itself was 'required.'").

professional, *see Quintanilla*, 62 A.3d at 1264-65. "The standard is objective: [t]he relevant inquiry is not whether a person in fact receives immediate medical attention but whether medical treatment beyond what one can administer himself is immediately required to prevent 'long-term physical damage, possible disability, disfigurement, or severe pain.'" *Teneyck*, 112 A.3d at 909 (quoting *In re R.S.*, 6 A.3d at 859).

Applying this standard in *Quintanilla*, this court considered whether the assault victim had received "medical attention" because she was "checked . . . out" "by some EMTs" who responded to the scene with an ambulance. These EMTs "took pictures of [her] head where [she] told them [she] had been hit," 62 A.3d at 1263, and they "checked [her] for a concussion" and provided some cold compresses, but they provided nothing more in the way of care. *Id.* We further noted that the complainant's head was "throbbing, sore and very tender to the touch" for a "week and a half" after she was attacked, and she suffered swelling from her "right eye to . . . behind [her] right ear." *Id.* at 1262. Her fingers were "swollen for about three weeks," and her index finger remained "unusable for about two months," but she took no further steps to address the swelling beyond "icing them," and never took any medication stronger than aspirin for the pain. *Id.* at 1262-63. Based on this record, we concluded that the complainant "received no

medical attention, as properly defined, and suffered no long-term consequences as 'significant' bodily injury requires." *Id.* at 1265-66.

This court again concluded that the government failed to prove an injury was "significant" in *Teneyck*, 112 A.3d at 911. There, the complainant was injured by a shard of broken glass after a would-be robber smashed the window of the vehicle in which the complainant was sitting. *Id.* at 908. The complainant chose to go to the hospital, where a physician removed the shard of glass. We explained that in the absence of evidence showing that the cuts were more severe than an "everyday household injury people treat on their own after handling broken glass"; that "professional medical treatment was required to remove the shard as opposed to just making removal easier"; that the complainant would suffer "any protracted injury to his hands as a result of the assault"; or that his pain was "severe," we could not infer, merely because a doctor tended to him, that his wounds *required* "immediate medical attention." *Id.* at 910-11.

By contrast, in *Nero v. United States*, this court determined that a gunshot wound was "significant" where the victim was "shot at close range and the bullet traveled through his bicep, causing 'obvious pain' and bleeding," and the victim's doctor "testified that similar wounds can be life-threatening." 73 A.3d at 158.

And most recently in *Blair*, this court concluded that the complainant suffered a "significant bodily injury" in the form of abrasions on her "face, around her eye, her neck, all four extremities, her feet and wrist, her back and shoulders, her abdomen, her buttocks, and her inner thighs," and a possible serious internal head injury as a result of the appellant repeatedly "banging her head against the ground." 114 A.3d at 979-81. We acknowledged that even this array of injuries might not obviously amount to significant bodily injury and that "not every blow to the head in the course of an assault necessarily constitutes significant bodily injury." 114 A.3d at 980. But we emphasized that the complainant's injuries, including obvious trauma to her face, eyes, jaw and neck, caused her physician to fear she had suffered a "significant head injury" and warranted an overnight stay in the hospital for professional diagnostic testing and monitoring. *Id.* at 979-80. We concluded that, under the circumstances, the need for such testing and monitoring constituted a need for medical attention.

The injuries experienced by M.G. in this case are properly categorized with those described in *Quintanilla* and *Teneyck*, not *Nero* and *Blair*. Apart from bruising to the face, M.G. was briefly unconsciousness for a minute or less, and "for like two, two/three days" after the incident she experienced "minor headaches." For these injuries she did not require or receive medical attention as

we have defined that term. Immediately after the incident, the EMTs "checked [her] head" and her blood pressure, but then released her (after she called her father), apparently concluding that it was appropriate to send her home without any further evaluation or care. *Cf. Teneyck*, 112 A.3d at 910 (suggesting that evidence a trip to the hospital was "optional" showed an injury did not require "immediate medical attention"); *Nero*, 73 A.3d at 158-59 (stating that an injury did not require "immediate medical attention" where the treating physician stated that "probably not much" would have happened had the complainant not received treatment); *Quintanilla*, 62 A.3d at 1265 (suggesting that EMTs' statements that the complainant "probably did not have a concussion" supported the conclusion that her injuries did not require "immediate medical attention"). Nor did M.G. seek out any medical attention later, or, as far as the record reflects, even self-administer over-the-counter medication.

*         *         *

We reiterate that the unprovoked assault of M.G. by D.P. and her friends cannot be condoned. But the government failed as a matter of law to prove either that D.P. had the requisite state of mind for aggravated assault, or that M.G. required medical treatment for her injuries such that they amounted to the requisite

"significant bodily injury" for felony assault. This assault was simply not "of the same order of magnitude" as those we have held warranted an aggravated assault or, in the lesser alternative, a felony assault conviction. *See Swinton*, 902 A.2d at 775. It was a simple assault, no more. Accordingly, we reverse D.P.'s adjudication of delinquency for her involvement in the charged crimes, and remand for entry of judgment that she was involved in a simple assault. *See Robinson v. United States*, 100 A.3d 95, 110-12 (D.C. 2014).

*So ordered*.