*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-814

CAMILLE COVINGTON, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2017-CF3-14886)

(Hon. Ronna L. Beck, Trial Judge)

(Argued October 27, 2021                    Decided July 7, 2022)

*Nancy E. Allen* for appellant.

*Sharon A. Sprague*, Assistant United States Attorney, with whom *Michael R. Sherwin*, Acting United States Attorney, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, *Nicole McClain*, and *Janani Iyengar*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH and DEAHL, *Associate Judges*, and THOMPSON,[*] *Senior Judge*.

---

[*] Senior Judge Thompson was an Associate Judge of the court at the time of argument. On October 4, 2021, she was appointed as a Senior Judge but she continued to serve as an Associate Judge until February 17, 2022. *See* D.C. Code § 11-1502 & 1504(b)(3) (2012 Repl.). On February 18, 2022, she began her service as a Senior Judge. *See* D.C. Code § 11-1504.

Opinion of the court by *Associate Judge* DEAHL.

Opinion by *Associate Judge* BECKWITH, dissenting, at page 23.

DEAHL, *Associate Judge*:  Camille Covington was convicted of aggravated assault while armed after she used a knife to stab and slash Rosario Sanchez repeatedly in her face and neck.  After the attack, Sanchez was transported to Howard University Hospital's emergency room where trauma surgeons acted quickly "to stop the bleeding," and then, to "repair" the damage.  On appeal, Covington argues that there was insufficient evidence to support a finding that Sanchez suffered a "serious bodily injury."  The government counters that it proved the "serious bodily injury" element of aggravated assault in two alternative ways: (1) that Sanchez suffered a "protracted and obvious disfigurement," and (2) that Sanchez endured "extreme physical pain."

We agree with the government on the first point and do not reach the second.  Of the five cuts to Sanchez's face that required stitches, two were particularly prominent.  One was about six centimeters in length, ran from Sanchez's right eyebrow up to her hairline, and required fourteen stitches.  The deeper cut was about twelve centimeters, or twice the length of the first, ran from Sanchez's upper lip across her left cheek, and required stitches "in multiple layers" to ensure "that the scarring w[ould] be much less."  The evidence as to those facial disfigurements was

sufficient for reasonable jurors to conclude that they were protracted and obvious, so as to constitute a serious bodily injury. We therefore affirm.

## I.

Rosario Sanchez and Camille Covington both had young children who attended Truesdell Elementary School in Northwest D.C. The two women did not know each other personally, but they occasionally saw one another while dropping their children off at school in the morning. According to Sanchez's testimony, a few weeks prior to the attack, Covington bumped into her as they passed on the sidewalk outside of the school. Sanchez told Covington to "please say excuse me," and after that incident Covington gave Sanchez "dirty looks" and laughed at her when they saw each other. On the morning of the attack, Sanchez was walking away from the school after dropping off her son, and Covington was walking toward it with her child. As their paths crossed, Covington again bumped Sanchez, knocking her off the sidewalk and into the grass. Sanchez told Covington to "look where she was walking," which made Covington "very upset." Sanchez, a Spanish speaker who testified through an interpreter, did not understand everything that Covington said, but testified that Covington responded by "yelling," "screaming," and "gesturing" at

her.  The two women then continued on their separate ways—Sanchez to her bus stop, and Covington toward the school.

About five minutes later, while Sanchez was waiting for her bus, she felt someone come up from behind her, pull her hair, punch her in the stomach, and then begin to deliver "blows" to her face.  She recognized her assailant as the same woman who bumped into her, whom she would later identify as Covington.  At first, Sanchez did not realize that she was being attacked with a knife, only that the blows were "breaking her face."  Her "eyes filled with blood" streaming from her forehead, and she had to wipe her eyes so that she was able to see.  Sanchez testified that she was "left . . . breathless" from the initial punch to her stomach and had to "hold[] onto [Covington's] shoulders" to avoid falling to the ground.  Sanchez also testified that during the attack, Covington repeatedly said that she "did not like Hispanic women."

As the attack continued, Antonio Guzman and his brother, Roberto Guzman, drove by in their truck.  They saw Covington attacking Sanchez, who was crying out for help, and heard Covington "saying, get out of my face," about six times.  The brothers parked and exited their car, and Roberto yelled for Covington to stop, warning that he would call the police.  Covington stopped attacking Sanchez and

began walking away from the scene, while Antonio followed her and Roberto stayed at the scene and called 911. When Covington noticed that Antonio was following her, she brandished a knife at him and said "don't follow me, motherfucker." Covington eventually got into the front passenger's seat of a car that was stopped at an intersection. The man in the driver's seat briefly exited "to try to scare" Antonio away, and then got back into the car with Covington and drove off. Antonio captured the car's license plate number and the driver was later identified as Matthew Brooks, Covington's next door neighbor.

Back at the scene, Sanchez's "head was really hurting" as she waited for an ambulance to arrive. She felt "very weak," knew that she was "losing a lot of blood, too much blood," and asked Roberto "please not to let her die." An ambulance came to the scene and rushed Sanchez to Howard University Hospital. When Sanchez arrived at the hospital, she was classified as on "yellow alert," though the evidence shed little light on what that meant. Sanchez was bleeding from the cuts to her face, of varying depths, and a cut on her neck. She was treated by Dr. Suryanarayana Siram, the head of the hospital's trauma center, who testified at trial. Dr. Siram described five cuts to Sanchez's face that required stitches, and one more superficial cut across her neck that did not. Three of the cuts to Sanchez's face were relatively

small—one to two centimeters—though one of those had ruptured a blood vessel and was actively bleeding.

The other two cuts were substantially larger, measuring approximately six and twelve centimeters (or about two-and-a-half and five inches), respectively. The six-centimeter cut ran from underneath Sanchez's right eyebrow, straight up through her forehead, stopping just short of her hairline. The doctors used "[a]round 14" stitches to close up that wound. The deepest and longest cut was about twice as long, measuring roughly twelve centimeters, and it extended from Sanchez's upper lip diagonally and jaggedly across her face to her upper left cheekbone, past the outer corner of her left eye. Dr. Siram explained that it required "multiple layers" of stitches "so that the scarring w[ould] be much less." According to Dr. Siram, Sanchez's wounds were generally "very deep" and could not have been effectively treated at home, as there would have been a "[h]igh chance of infection and ongoing bleeding." Sanchez was discharged from the hospital later the same day. The record does not provide evidence about whether she was prescribed painkillers or other medications, or about any follow-up medical care for her wounds.

Covington was not identified as the assailant until nearly a year later. While police quickly found and questioned her neighbor, the getaway driver, he claimed

that he gave an unknown woman a ride because she appeared to be in distress and was being followed by a man. Officers also put together a photo array that included Covington's picture and showed it to Sanchez two days after the attack, but when asked to identify her assailant, Sanchez "started crying" and did not identify anybody. It was not until early in the following school year that Sanchez again saw and recognized Covington at school drop off; she contacted police and subsequently identified Covington as her assailant.

Covington was tried on four charges. In relation to the attack on Sanchez, she was charged with: (1) assault with intent to kill while armed, (2) malicious disfigurement while armed, and (3) aggravated assault while armed, all of which were charged as "bias-related" crimes. Covington was also charged with (4) assault with a dangerous weapon in relation to her brandishing a knife at Antonio, while telling him not to follow her. The trial was focused primarily on the question of identity, as Covington maintained she was not the person who attacked Sanchez. At the close of the government's evidence, defense counsel made a motion for judgment of acquittal (MJOA), stressing that there had been no in-court identification of Covington as the assailant. The trial court denied the motion, highlighting Sanchez's out-of-court identification along with other evidence corroborating it. Aside from challenging the adequacy of the evidence as to her identification, defense counsel

did not suggest the evidence was otherwise deficient in any respect as to the aggravated assault or the malicious disfigurement charge.

Defense counsel renewed her MJOA at the close of the defense case, and the trial court denied the motion as to all but the malicious disfigurement charge. As to that final charge, the trial court questioned, sua sponte, whether the government had elicited sufficient evidence of "permanent disfigurement" to support a malicious disfigurement conviction. While the government stressed that the jury could still see the scars on Sanchez's face during her trial testimony—nearly three years after the attack—the court concluded that the government failed to make "a record of any kind whatsoever about the scarring" still visible on Sanchez's face and failed to show "that it was tied to this incident." The court also asked the government what "serious bodily injury" Sanchez had suffered to support the aggravated assault charge, noting that element might be satisfied by "an injury that involves unconsciousness, extreme physical pain, [or] protracted and obvious disfigurement," amongst other things. In response, the government primarily stressed Sanchez's testimony that she suffered "extreme pain"—defense counsel conceded there was such evidence—though it also noted "the lacerations" on Sanchez's face in support of that charge. The court agreed there was sufficient evidence of aggravated assault to submit that charge, along with

the assault with intent to kill and assault with a dangerous weapon charges, to the jury.

The jury acquitted Covington of assault with intent to kill while armed, convicted her of aggravated assault while armed—though not as a bias-related crime—and convicted her of assault with a dangerous weapon. Covington now brings this appeal.

## II.

Covington's sole challenge in this appeal is to the sufficiency of the evidence supporting her aggravated assault conviction. More specifically, she argues that there was insufficient evidence that Sanchez suffered a "serious bodily injury," which is an injury that "involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ or mental faculty." *Nixon v. United States*, 730 A.2d 145, 149 (D.C. 1999). The government counters that it provided sufficient evidence both of protracted and obvious disfigurement and of extreme pain, noting that affirmance is warranted if we agree with it on either point. Before we address the merits, we first address the parties' dispute about our standard for reviewing Covington's sufficiency challenge.

**A.**

Covington argues that we should review her sufficiency challenge de novo, while the government counters that we should review it only for plain error. Underlying their disagreement is the fact that, in the trial court, Covington's MJOA specifically challenged the sufficiency of the evidence as to her identity as the assailant, but never challenged the sufficiency of the evidence that Sanchez suffered a serious bodily injury.

The parties' disagreement raises an interesting wrinkle in our precedents, though it is not one we need to iron out today. "It is settled law in the District that in a jury trial, 'a general motion for acquittal . . . is deemed sufficient to preserve the full range of challenges to the sufficiency of the evidence.'" *Campbell v. United States*, 163 A.3d 790, 793 (D.C. 2017) (quoting *Newby v. United States*, 797 A.2d 1233, 1238 (D.C. 2002)); *see also Abdulshakur v. District of Columbia*, 589 A.2d 1258, 1264 (D.C. 1991) (stating that the grounds for an MJOA "need not be stated with specificity unless the prosecutor so requests"). It is less clear, however, what arguments are preserved by a more targeted MJOA like the one we confront here, as "many courts, including most federal courts, have held that if a defendant specifies the grounds for an MJOA, 'he may not later contend that there were other areas upon

which his motion for judgment of acquittal would lie.'" *Campbell*, 163 A.3d at 793 (quoting *State v. Kreps*, 661 P.2d 711, 714 n.1 (Haw. Ct. App. 1983); *see also United States v. Spinner*, 152 F.3d 950, 955 (D.C. Cir. 1998). In other words, while a general MJOA will preserve the universe of sufficiency challenges on appeal, there is considerable (albeit far from uniform) support for the view that a more targeted MJOA will forfeit alternative grounds that were not raised. *See Davis v. United States*, 367 A.2d 1254, 1268-69 (D.C. 1976) (venue challenge was not preserved for appeal where defendant moved for judgment of acquittal on specific grounds without challenging venue).

We have previously acknowledged but declined to resolve this uncertainty in our precedents. *Campbell*, 163 A.3d at 794 ("[W]e need not resolve the question whether [*Davis*'s] rule of forfeiture extends beyond the context of a challenge to venue."); *Abdulshakur*, 589 A.2d at 1264 ("[T]his court has never decided" whether a defendant who has specified a particular basis for his MJOA may "later contend that there were other areas upon which his MJOA would lie."). We likewise do not resolve it today, because even assuming a de novo standard of review applies, Covington's sufficiency challenge fails.

**B.**

There are three gradations of assault in the District of Columbia. *In re D.P.*, 122 A.3d 903, 908 (D.C. 2015). The least serious is simple assault, a misdemeanor that does not require any degree of physical injury. *Id.*; *see* D.C. Code § 22-404(a)(1) (2022 Supp.). The "intermediate" offense is "felony assault," or assault with significant bodily injury, which is an assault accompanied by "an injury that requires hospitalization or immediate medical attention." *In re D.P.*, 122 A.3d at 908, 911; *see* D.C. Code § 22-404(a)(2). The most serious is aggravated assault, which is an assault resulting in "serious bodily injury." *In re D.P.*, 122 A.3d at 908; *see* D.C. Code § 22-404.01(a)(1)-(a)(2). A serious bodily injury is one that "involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty." *Nixon*, 730 A.2d at 149. We have repeatedly stressed that aggravated assault involves a "high threshold of injury," often involving "life-threatening or disabling" injuries. *Swinton v. United States*, 902 A.2d 772, 775 (D.C. 2006). "[E]ven injuries such as knife or gunshot wounds are not per se 'serious bodily injury.'" *Zeledon v. United States*, 770 A.2d 972, 977 (D.C. 2001).

Covington argues that the government presented insufficient evidence of serious bodily injury to sustain her aggravated assault conviction. The government counters that when the evidence is viewed in the light most favorable to upholding the jury's verdict, as required on sufficiency review, *Swinton*, 902 A.2d at 776, n.6, it demonstrated a serious bodily injury in two independent ways: (1) it proved Sanchez suffered a protracted and obvious disfigurement, to wit, the cuts across her face, and (2) it showed she endured "extreme physical pain," as we have elucidated that phrase, *see generally Jackson v. United States*, 940 A.2d 981, 987-90 (D.C. 2008).

We limit our consideration to the evidence of protracted and obvious disfigurement. In order to establish that brand of serious bodily injury, the government must prove "(1) that [the victim] suffered a 'serious physical disfigurement,' (2) that the disfigurement was 'protracted' in that it remained beyond a brief recovery period, and (3) that the disfigurement had a 'a degree of genuine prominence' sufficient to make it 'obvious.'" *Jackson*, 940 A.2d at 991.[1]

---

[1] Malicious disfigurement, by contrast, requires evidence of "permanent" disfigurement, whereas a protracted disfigurement, is "a condition of lesser duration." *Hudson v. United States*, 790 A.2d 531, 533-34 (D.C. 2002); *see also Jackson*, 940 A.2d at 991 (expressing "no doubt" of protracted disfigurement when scarring present eight months after assault).

*1. Serious and Obvious Disfigurement.*

There was sufficient evidence that the cuts across Sanchez's face were a severe and obvious disfigurement, satisfying the first and third prongs above. The government introduced a series of photographs depicting the stab wounds to Sanchez's face, two of which are appended to this opinion. Including Dr. Siram's testimony, the evidence showed that the most prominent of Sanchez's facial lacerations was "very deep," about five inches in length, cut jaggedly across the center of Sanchez's face, and required multiple layers of stitches. As to that particular wound, Dr. Siram also explained that care had to be taken to "approximate," or bring together, Sanchez's lip where it had been sliced open in order to prevent "rigorous scarring." It goes without saying that "scars in the center of one's face are more visible and prominent—and thus more disfiguring—than they might be elsewhere." *Gathy v. United States*, 754 A.2d 912, 917 (D.C. 2000); *Jackson*, 940 A.2d at 992 (scarring on ear and shins not sufficiently "obvious" to sustain aggravated assault conviction).

Sanchez's injuries most closely resemble those in *Gathy*, where we held there was sufficient evidence to find a protracted and obvious disfigurement. 754 A.2d at 917-19. In that case, the defendant broke a beer bottle over a bouncer's face, and

the bouncer sustained one laceration over his left eyebrow and another "extending from the bridge of his nose across his left cheek." *Id*. at 918. It took forty-eight "layered" stitches to repair those wounds. *Id*. We determined the disfigurement was "protracted and obvious" in light of photographs—one taken minutes after the assault, and the other a week later—and medical records. *Id.* at 914-15, 918-19. As in *Gathy*, Sanchez's facial wounds required dozens of stitches,[2] in layers, with the most prominent of the wounds running across the center of her face.

On the flip side, the wounds here are dissimilar from those that we have held to be insufficiently obvious or severe to constitute an obvious disfigurement. *Jackson*, for instance, involved a series of cuts, none longer than four centimeters, to the victim's ear, the back of her head, and her shins. 940 A.2d at 984. We held the resulting scars were not sufficiently prominent to support an aggravated assault

---

[2] Unlike in *Gathy*, we do not know precisely how many stitches it took to suture the victim's facial wounds. Dr. Siram estimated, based on the pictures, that fourteen stitches were used to close the gash to Sanchez's forehead, and there are several other visible stitches mending the smaller wounds to Sanchez's face. But Dr. Siram was not asked how many stitches were used in the wound cutting across the center of Sanchez's face. Unlike the stitches in Sanchez's forehead, which one can roughly count from the photographic evidence (as Dr. Siram did when testifying), one cannot approximate how many stitches were used in this deeper and longer cut based on the photographs alone because the stitches were in "multiple layers," with some beneath the skin and not visible in the photographs. The precise number of stitches is not particularly important, and it is enough to say here that it took dozens of stitches to close Sanchez's facial wounds.

conviction, though in doing so, we expressly contrasted the wounds with "deep cuts to the center of the victim's face," like the ones we confronted in *Gathy* and likewise confront here. *Id.* at 993. Central to our holding in *Jackson* was that the wounds were in areas "far less likely to have an appreciable effect on" the victim's physical appearance than those in the center of the face. *Id*.

Similarly, in *Stroman v. United States*, we said that a single cut to the forehead requiring fifteen stitches, caused by the defendant hitting her neighbor with a flip flop, "cannot reasonably be characterized as falling within the definition of great bodily injury." 878 A.2d 1241, 1246 (D.C. 2005).[3] That injury is superficially

---

[3] *Stroman* was not an aggravated assault case, but instead arose from a prosecution for attempted possession of a prohibited weapon (PPW) after the defendant hit somebody in the head with a flip flop. 878 A.2d at 1244. The question under the PPW statute is not whether a serious bodily injury was in fact inflicted, but instead whether an object was used in a manner "*likely to produce* death or great bodily injury," which is synonymous with serious bodily injury. *Id.* at 1245 (emphasis added); *Jackson*, 940 A.2d at 992 n.5. The questions are substantially different—one might use an object in a manner that is quite unlikely to inflict great bodily injury, but nonetheless do so, just as one might use an object in a manner very likely to inflict great bodily injury, but fail to do so. Despite the disparate inquiries, *Stroman* seems to hold that the cut to the victim's forehead was not a great bodily injury, and we have treated it as a holding on the question of what constitutes a serious bodily injury. *Jackson*, 940 A.2d at 992 (*Stroman* "held, as a matter of law," that the injury was not "sufficiently severe and prominent to be deemed 'protracted and obvious'"); *cf. Cardozo v. United States*, 255 A.3d 979, 991 n.8 (D.C. 2021) (Deahl, J., concurring) (discussing "precedent on precedent," where there is some

similar to the gash running from Sanchez's eyebrow to her hairline: both required about the same number of stitches and ran along the forehead, though *Stroman* does not offer a description (e.g., length, or precise location) beyond that. But unlike in *Stroman*, here we have multiple other stab wounds to Sanchez's face in addition to the gash across her forehead. One of those additional wounds, about twice as long as Sanchez's forehead wound, (1) was in a more prominent area of her face, running from her lip to the top and outer portion of her cheek, (2) required layered stitches, which there was no indication of in *Stroman*, and (3) resulted from being stabbed in the face with a knife, as opposed to hit with a flip flop.[4] Based on those additional factors, absent in *Stroman*, plus the similarities between these wounds and those in *Gathy*, we conclude the disfigurement here was serious and obvious.

*2. Protracted Disfigurement.*

---

perceived tension between what a precedent held on its own terms and how we have subsequently interpreted that precedent).

[4] While we are focused on the severity and prominence of the disfigurement here, rather than its mechanism, the mechanism of an injury can shed light on its severity. One might reasonably infer that a hand crushed by a bulldozer is more seriously injured than one crushed by a shod foot, just as they might infer that stab wounds to the face are generally more serious than those inflicted via flip flop.

Whether Sanchez's disfigurement was protracted presents a somewhat trickier question. There is no particular duration that a disfigurement must last to be considered protracted, though it must, at a minimum, persist "beyond a brief recovery period." *Jackson*, 940 A.2d at 981. In applying that principle, we said in *Jackson* that where scarring was still present eight months after the assault, it was beyond doubt that the disfigurement was protracted. *Id.* at 991. Similarly, in *Gathy*, we relied on a photograph of the facial lacerations taken one week after the attack as evidence that the disfigurement was "long-lasting—'protracted,' in the language of the statute—even if not permanent." 754 A.2d at 919. By contrast, in *Swinton*, we held that mere bruises were not sufficiently protracted after noting that "bruises fade, often rapidly," and there was no evidence of how long the victim's "bruises remained prominent, or even visible." 902 A.2d at 777. A deep and jagged stab wound in the middle of one's face, nearly five inches in length, would seem to invariably fall on the protracted side of that dividing line.

Yet, this issue is not open-and-shut, because the government presented virtually no evidence regarding how long Sanchez's facial scars remained visible. It did not ask Sanchez, or any other witness, how long the scars were apparent. On appeal, the government urges us to rely on the fact that "scarring was evident on Ms. Sanchez's face at trial, almost three years after the attack," pointing out that "both

the prosecutor and the trial court made note of these scars" without refutation. We cannot do that because the representations the government references were not evidence, and were not even made in the jury's presence. While all signs suggest that there was visible scarring on Sanchez's face when she testified,[5] the government neither tied those scars to this incident nor described them in any way that would permit us to discern whether jurors could reasonably make that link themselves. As the trial court reasoned when granting judgment of acquittal on the malicious disfigurement charge, the government did not make "a record of any kind whatsoever about the scarring [visible at trial] or that it was tied to this incident."

Despite that record deficiency, we conclude that a jury could reasonably find that the disfigurements were protracted, based on the photographs and descriptions of Sanchez's injuries along with the medical testimony. The photographic evidence showed a long and jagged stab wound cutting across the center of Sanchez's face, and the medical testimony was that it was a deep cut requiring multiple layers of stitches. Unlike the bruises we discussed in *Swinton*, "common experience teaches

---

[5] At sentencing, Sanchez left little doubt that she still had visible scarring on her face from the attack, though that too was not evidence before the jury. In her victim impact statement, she said: "Every day when I look in the mirror, I am reminded by what happened that day," "I hate that people can look at my face and just know that something horrible happened," and "I think that when people see me they must think that it is difficult for me to go around looking like this."

that wounds requiring multiple stitches are likely to leave some scarring, however faint, and that scars in the center of one's face are more visible and prominent—and thus more disfiguring—than they might be elsewhere." *Gathy*, 754 A.2d at 918. Additionally, Dr. Siram testified that in suturing the long cut across Sanchez's face, his efforts were directed to ensuring "that the scarring w[ould] be much less," and to prevent "any rigorous scarring." Implicit in that testimony is that some long-term scarring was unavoidable. Dr. Siram's testimony, taken in conjunction with photographic evidence of the multiple stab wounds to Sanchez's face, leads us to conclude that reasonable jurors could conclude Sanchez suffered a protracted and obvious disfigurement.

The dissent disagrees, but offers no persuasive way to distinguish *Gathy*. In an effort to circumvent it, the dissent stresses that the evidence in *Gathy* included one picture that was taken a week after the injury—which "could give a sense of how the injuries were healing and how they would heal"—whereas here, we have only day-of photographs.[6] *Post* at 26-27. That is a hollow distinction, given that the

---

[6] The dissent also alludes to unspecified "[m]edical advancements" that may have rendered obsolete *Gathy*'s guidance that deep wounds to the face requiring layered stitches "are likely to leave some scarring." *Post* at 25 n.10. The dissent's musings aside, we see no basis for doubting the continued vitality of that observation.

only description of the week-after photograph in *Gathy* is that it "showed the scars and stitches on [the victim's] face," and from that the court concluded "that the disfigurement of [the victim's] face was obvious and long-lasting—'protracted,' in the language of the statute." 754 A.2d at 915, 919. There can be no serious doubt— no reasonable doubt—based on the contemporaneous photographs of Ms. Sanchez, that she had prominent scarring on her face a week after the attack. A week-after photograph showing as much would have been redundant of the already obvious, and its absence here is thus no basis for distinguishing *Gathy*.

The dissent also repeatedly mislabels natural and reasonable inferences as speculation, in contravention of our obligation to "view the evidence in the light most favorable to the government" on sufficiency review, allowing for "justifiable inferences of fact." *Taylor v. United States*, 267 A.3d 1051, 1058 (D.C. 2022).[7] Jurors need not check their common sense at the courthouse doors, but are permitted

---

[7] That includes when the dissent seems to cast doubt on whether there were "dozens of stitches" on Sanchez's face, despite that requiring no inference at all. *Post* at 25 n.10. All one needs to do is look at the photographs attached to this opinion and count the stitches that are readily apparent. There are at least a dozen stitches mending Sanchez's forehead wound alone—fourteen by Dr. Siram's count—plus several under her right eye, and still several more on the left side of her face and forehead. The "dozens" descriptor is thus fitting even if we disregard the longest and deepest wound cutting across the middle of Sanchez's face, and even if we ignore the natural inference that longer and deeper wounds with layered stitches require more sutures than shorter and shallower wounds without them.

"to use 'the saving grace of common sense' and their 'everyday experience' to draw reasonable inferences from the evidence presented." *Long v. United States*, 156 A.3d 698, 714 (D.C. 2017) (quoting *Hebron v. United States*, 837 A.2d 910, 914 (D.C. 2003)). Deep and jagged stab wounds spanning five inches across the middle of one's face are bound to leave a prominent mark, for a protracted period of time. The dissent is free to disagree with that assessment, but to conclude that the jurors who shared it acted irrationally simply blinks reality. *See generally Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc) (sufficiency review asks whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt").

## III.

The Superior Court's judgment is affirmed.

*So ordered.*

BECKWITH, *Associate Judge*, dissenting:  The trial court in this case concluded that the government failed to make "any record of any kind whatsoever about the scarring" on Rosario Sanchez's face and failed to show that any scarring "was tied to this incident."  My colleagues in the majority similarly acknowledge that the government "presented virtually no evidence" on the question whether Ms. Sanchez suffered "protracted" disfigurement and describe this aspect of Camille Covington's sufficiency claim as a "trick[y] question."  *Ante* at 18.  I think the question is sufficiently tricky to compel the conclusion that the government failed to prove the "serious bodily injury" element of aggravated assault beyond a reasonable doubt.  I therefore respectfully dissent from the majority's holding that the evidence was nevertheless sufficient to support Ms. Covington's conviction of the most serious (and most severely punished) of the three levels of assault in the District of Columbia.[8]  We should vacate Ms. Covington's conviction and instruct the trial

---

[8] *See White v. United States*, 207 A.3d 580, 588 (D.C. 2019).  A defendant can serve up to 180 days for a conviction of simple assault, D.C. Code § 22-404(a)(1) (2022 Supp.), three years for a conviction of assault causing significant bodily injury, D.C. Code § 22-404(a)(2), and ten years for a conviction of aggravated assault causing "serious bodily injury," D.C. Code § 22-404.01 (2022 Supp.).  If committed while armed, aggravated assault can result in a sentence of thirty years. D.C. Code § 22-4502 (2022 Supp.).

court to enter judgment on felony assault—the intermediate form of assault that Ms. Covington concedes the government proved here.[9]

The majority states that despite the lack of evidence about the protracted nature of any obvious scars, two things in the record—the testimony of the doctor who treated Ms. Sanchez and the photographs from the day of the offense—were enough to support a reasonable inference that the disfigurement was "long[]lasting." *Gathy v. United States*, 754 A.2d 912, 919 (D.C. 2000).

With respect to the medical testimony, Dr. Siram did not testify—or remotely suggest—that "some long-term scarring was unavoidable." *Ante* at 20. The majority's view that this conclusion was "implicit" in Dr. Siram's references to his efforts to lessen "any rigorous scarring" is unsupported by a natural or even charitable reading of the doctor's testimony. Though more pointed followup questioning on the subject could have either closed or accentuated the gap in the evidence, we cannot reasonably glean from Dr. Siram's vague references to scarring

---

[9] I would find Ms. Covington's sufficiency claim preserved, but even if it was not, reversal would be warranted because sustaining a conviction on insufficient evidence would result in a clear miscarriage of justice. *See Abdulshakur v. District of Columbia*, 589 A.2d 1258, 1264 (D.C. 1991); *see also United States v. Olano*, 507 U.S. 725, 732 (1993); *Campbell v. United States*, 163 A.3d 790, 794 n.4 (D.C. 2017).

an inference that some scarring was inevitable. And even if Dr. Siram had opined that Ms. Sanchez was destined to have some kind of scarring—words that, again, he never said or implied—our case law does not support the proposition that any scarring on the face, however faint, will amount to "obvious and protracted" disfigurement. *See, e.g.*, *Stroman v. United States*, 878 A.2d 1241, 1246 (D.C. 2005) (concluding that a wound on the forehead requiring fifteen stitches "could not reasonably be characterized as falling within the definition of great bodily injury").[10] That is, there must be evidence sufficient to conclude that the disfigurement was

---

[10] The majority distinguishes *Stroman* in part based on the fact that some of Ms. Sanchez's stitches were "layered," as were the complainant's in *Gathy*. But as the majority notes elsewhere, Dr. Siram testified that layering was used to *reduce* scarring. Although it may be fair to infer that layered stitches are used for deeper cuts, it is not fair to infer (without any medical testimony to this effect) that a deeper cut—when sutured with a technique used to reduce scarring—will result in more "obvious" disfigurement than a cut requiring a single layer of stitches.

As to the purported similarity between Ms. Sanchez's injuries and those in *Gathy*, the "dozens" of stitches in that case were, to be precise, forty-eight stitches. 754 A.2d at 918. Even if there were "dozens of stitches" here, *ante* at 15 n.2, nothing in the record suggests that there were close to fifty. And, in any event, reliance on the number of stitches, in the abstract, does little to tell us (or a lay jury) about how protracted and obvious a wound will be, as more stitches—like "layering" techniques—might be used to reduce visible scarring. These medical techniques, it should be noted, are frequently advancing—which is another reason it is important to ensure that a "protracted and obvious" disfigurement finding based on a projected course of healing is supported by specific and relevant evidence. Medical advancements also mean that what *Gathy* opined about "common experience teach[ing] that wounds requiring multiple stitches are likely to leave some scarring," *id.*, might carry little weight today, some twenty years later.

obvious and protracted at the same time. *See Jackson v. United States*, 940 A.2d 981, 991–92 (D.C. 2008) (finding that the complainant's disfigurement was "protracted" as her scars persisted at the time of trial but that the evidence did not establish "protracted *and obvious*" disfigurement because the only evidence showing the severity, prominence, or appearance of the scars was from the immediate wake of the incident (emphasis added)). It cannot be obvious and then protracted, constituting an "obvious" disfigurement when the injury first happens but then persisting, however lightly, past the recovery period.

The photographs from the day Ms. Sanchez sustained the injury are equally speculative on the question whether any obvious disfigurement would be long lasting. In *Gathy*, the case on which the majority primarily relies, the jury was at least shown photographs of the complainant's injuries taken a week after the assault. 754 A.2d at 918–19. Although one week would not be a sufficiently long time for visible scarring to qualify as "protracted," *see Jackson*, 940 A.2d at 991 (noting that to be "protracted" a disfigurement must "remain[] beyond a brief recovery period"), photos showing a complainant's wounds after a week can be relevant to show how healing is progressing, *see id.* at 992 (noting that a doctor was able to say at the one-week followup examination how the wounds were healing and whether they would leave cosmetic scars). Thus, there was evidence in *Gathy* that could give a sense of

how the injuries were healing and how they would heal—evidence that the government did not present here. Photographs taken before the cuts had even begun to heal cannot fill that gap.

The unfounded conclusions the majority draws from Dr. Siram's mention of scarring and from photographs taken in the immediate wake of the assault are not a viable substitute for straightforward proof of the actual severity and prominence of Ms. Sanchez's injuries over time—something the government easily could have presented if there was evidence to support it.[11] But the prosecutor never described Ms. Sanchez's face for the record. She never asked Ms. Sanchez to describe it herself. She never asked Dr. Siram about Ms. Sanchez's actual scarring or potential for long-term scarring. And she never presented photos of Ms. Sanchez's face that were taken any time after the day she was assaulted and treated for her injuries.

---

[11] The majority's statement that "the mechanism of an injury" is proof of an injury's severity is also weak grounds to compensate for the lack of proof of the severity or protracted nature of Ms. Sanchez's injuries. *See ante* at 17 n.4. As an abstract proposition, it is perhaps unremarkable. But the best way of establishing the seriousness of an injury caused by a knife or a gun or a bulldozer is to present actual evidence of the nature and severity of the wound. The fact that Ms. Covington attacked Ms. Sanchez with a knife might corroborate such evidence, but in its absence, it does not in itself amount to proof of serious bodily injury.

This is not to say that Ms. Sanchez did not suffer a devastating injury as a result of this violent assault. We need not minimize that injury in order to hold the government to its burden to prove the elements of aggravated assault beyond a reasonable doubt. Again, it's possible that the government could readily have proved that Ms. Covington's assault caused serious bodily injury. *See United States v. Johnson*, 46 F.3d 1166, 1170 (D.C. Cir. 1995) (stating that if the government could "easily have established" the element in question, "we have no idea why the government did not prove it"). But speculation is not a permissible substitute for probative evidence, and "a court reviewing the sufficiency of the evidence cannot rely on facts of which no record is made." *People v. McKinnon*, 937 N.E.2d 524, 527 (N.Y. 2010); *id.* (declining "the prosecution's invitation to infer . . . that whatever the jury saw [when the victim displayed her scars to the jury] must have supported its verdict" and stating that "[a] contemporaneous photograph or description is not necessary in every case where a victim's wound is shown to a jury—but it is necessary where, as here, there is no other evidence in the record supporting an inference that what the jury saw amounted to serious disfigurement").[12]

---

[12] In *McKinnon*, the record evidence also contained pictures of the wounds "taken on the day of the crime." 937 N.E.2d at 526. The court noted that there was "no later photograph of the wounds, and the record as to what they looked like after they had time to heal is not precise." *Id.* The same is true here.

The right to be convicted only upon proof of each element beyond a reasonable doubt is no technicality—it is "a fundamental aspect of due process." *Mejia-Cortez v. United States*, 256 A.3d 210, 218 (D.C. 2021). In this case, the combination of the photographs from the day of the offense and Dr. Siram's vague and unexplored references to "any scarring" do not support a reasonable inference that Ms. Sanchez suffered "protracted and obvious disfigurement." We should reverse the aggravated assault while armed conviction,[13] enter judgment on the lesser offense of assault with significant bodily injury while armed,[14] and remand for resentencing.

---

[13] As the majority notes, the government has argued that another basis for finding "serious bodily injury" is "extreme physical pain." The majority understandably does not take this route—despite acknowledging that the sufficiency of the evidence of protracted disfigurement is by no means "open-and-shut"—as the government did not present the "substantial and well-documented evidence of pain" that our case law has required. *Jackson*, 940 A.2d at 988–91; *see also White*, 207 A.3d at 590 ("[P]ain that allows victims to 'pursue[] their normal lives' does not rise to the standard of 'extreme.'" (alteration in original) (quoting *Alfaro v. United States*, 859 A.2d 149, 161 n.13 (D.C. 2004))).

[14] The government proposed in its brief that this court should remand for entry of judgment on the lesser-included offense if it found insufficient evidence of aggravated assault while armed, noting that Ms. Covington did not contest that Ms. Sanchez suffered "significant bodily injury." Ms. Covington did not challenge this representation, and indeed her counsel conceded at oral argument that the evidence was sufficient to sustain a conviction for the intermediate form of assault (while armed).

# Appendix



GOVERNMENT
EXHIBIT



GOVERNMENT
EXHIBIT
9